**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 13 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

_____

WYOMING FARM BUREAU FEDERATION;
MONTANA FARM BUREAU FEDERATION;
AMERICAN FARM BUREAU FEDERATION;
MOUNTAIN STATES LEGAL FOUNDATION; IDAHO
FARM BUREAU FEDERATION; NATIONAL
AUDUBON SOCIETY, a nonprofit corporation;
PREDATOR PROJECT, a nonprofit corporation;
SINAPU, a nonprofit corporation; GRAY WOLF
COMMITTEE, a conservation group,

     Plaintiffs-Appellees,

CAT D. URBIGKIT; JAMES R. URBIGKIT,

     Plaintiffs-Appellees and Cross-Appellants,

v.

BRUCE BABBITT, Secretary of Department of Interior;
GEORGE T. FRAMPTON, Assistant Secretary of Fish
and Wildlife and Parks, Department of Interior; JAMIE
CLARK, Director of United States Fish and Wildlife
Service; RALPH O. MORGENWECK, Regional Director
of United States Fish and Wildlife Service; EDWARD E.
BANGS, Project Leader of Gray Wolf EIS; ROGER
KENNEDY, Director of National Park Service; DANIEL
GLICKMAN, Secretary of Department of Agriculture;
MICHAEL DOMBECK, Chief Forester of United States
Forest Service, in their official capacities;
DEPARTMENT OF INTERIOR; UNITED STATES
FISH AND WILDLIFE SERVICE;

Nos. 97-8127
     98-8000
     98-8007
     98-8008
     98-8009
     98-8011

NATIONAL PARK SERVICE; DEPARTMENT OF AGRICULTURE; UNITED STATES FOREST SERVICE; UNITED STATES OF AMERICA,

Defendants-Appellants and Cross-Appellees,

-------------------

NATIONAL WILDLIFE FEDERATION; WYOMING WILDLIFE FEDERATION; IDAHO WILDLIFE FEDERATION; WOLF EDUCATION AND RESEARCH CENTER; DEFENDERS OF WILDLIFE,

Intervenors-Appellants,

NEZ PERCE TRIBE,

Intervenors.

**Appeals from the United States District Court
for the District of Wyoming
(D.C. No. 94-CV-286)**

Timothy S. Bishop (Todd S. Welch and William Perry Pendley of Mountain States Legal Foundation, Denver, Colorado; John J. Rademacher and Richard L. Krause of American Farm Bureau Federation, Park Ridge, Illinois, on the briefs), Chicago, Illinois, for Plaintiffs-Appellees.

James R. Urbigkit, pro se, for Plaintiffs-Appellees and Cross-Appellants.

M. Alice Thurston (Lois J. Schiffer, Assistant Attorney General, James C. Kilbourne, Ellen Durkee, and Christiana P. Perry, Department of Justice, Washington, D.C.; Margot Zallen, Denver, Colorado, and David Gayer, Washington, D.C., of counsel, Department of Interior, with her on the briefs) of Department of Justice, Washington, D.C., for Defendants-Appellants and Cross-Appellees.

Brian B. O'Neill (Richard A. Duncan and Jonathan W. Dettmann of Faegre & Benson LLP, Minneapolis, Minnesota; Russell O. Stewart and Colin C. Deihl of Faegre & Benson LLP, Denver, Colorado, with him on the briefs for Defenders of Wildlife; Thomas France and Thomas Lustig of National Wildlife Federation, Missoula, Montana, with him on the briefs for National Wildlife Federation, Wyoming Wildlife Federation, Idaho Wildlife Federation, and Wolf Education and Research Center) of Faegre & Benson LLP, Minneapolis, Minnesota, for Intervenors-Appellants.

Douglas L. Honnold (James S. Angell with him on the briefs) of Earthjustice Legal Defense Fund, Bozeman, Montana, for Predator Project, Sinapu, and Gray Wolf Committee.

Louis R. Cohen, James R. Wrathall, Matthew A. Brill, and Susan A. MacIntyre, of Wilmer, Cutler & Pickering, and Elizabeth Fayad, of Counsel, National Parks and Conservation Association, Washington, D.C., filed an amicus curiae brief on behalf of National Parks and Conservation Association, in support of the Department of the Interior.

Michael J. Bean, Environmental Defense Fund, Washington, D.C., and James B. Martin, Boulder, Colorado, Environmental Defense Fund, filed an amici curiae brief on behalf of Environmental Defense Fund, World Wildlife Fund, Wildlife Conservation Society, Izaak Walton League of America, Idaho Conservation League, Wolf Recovery Foundation, and Center for Marine Conservation.

Herman Kaufman, Old Greenwich, Connecticut, filed an amicus curiae brief on behalf of Friends of Animals, Inc.

David J. Cummings, Lapwai, Idaho, filed an amicus curiae brief on behalf of Nez Perce Tribe.

James C. Hill, Washington, D.C., filed an amicus curiae brief, pro se, in support of Plaintiffs-Appellees.

————————————

Before **BRORBY, HOLLOWAY** and **HENRY**, Circuit Judges.

————————————

**BRORBY**, Circuit Judge.

These consolidated appeals stem from three separate challenges to the Department of Interior's ("Department") final rules governing the reintroduction of a nonessential experimental population of gray wolves in Yellowstone National Park ("Yellowstone") and central Idaho. The district court consolidated the challenges and struck down the wolf reintroduction rules, concluding they (1) are contrary to Congress' clear intent under section 10(j) of the Endangered Species Act, 16 U.S.C. § 1539(j), to prevent lessening the protection afforded to naturally occurring, individual members of the same species; (2) are contrary to the Department's own regulations extending Endangered Species Act protections to all individual animals within an area where experimental and nonexperimental populations may overlap; and (3) conflict with section 4 of the Endangered Species Act, 16 U.S.C. § 1533, by operating as a de facto "delisting" of naturally occurring wolves. *Wyoming Farm Bureau Fed'n v. Babbitt*, 987 F. Supp. 1349, 1372-76 (D. Wyo. 1997). The district court ordered the reintroduced non-native wolves and their offspring removed from the identified experimental population areas, but stayed its own judgment pending this appeal. *Id*. at 1376. Discerning no conflict between the challenged experimental population rules and the Endangered Species Act, we reverse the district court's order and judgment.

I.  Background

A.      Factual Summary

Detailed facts underlying this appeal are set forth in *Wyoming Farm Bureau Fed'n v. Babbitt*, 987 F. Supp. 1349 (D. Wyo. 1997); hence, we provide only a summary of salient facts.

The Secretary of Interior ("Secretary") listed the Northern Rocky Mountain Wolf, an alleged subspecies of the gray wolf, as an endangered species under the Endangered Species Act of 1973.  43 Fed. Reg. 9607 (March 9, 1978) ("Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota").  In 1978, the Secretary listed the entire gray wolf species as endangered in the lower forty-eight states, except Minnesota.[1]  *Id.* at 9610, 9612.  In 1980, a team organized by the Department of Interior completed its Northern Rocky Mountain Wolf Recovery Plan ("Recovery Plan"), pursuant to the Endangered Species Act.  The Department updated the Recovery Plan in 1987 to recommend the introduction of at least ten breeding pairs of wolves for three consecutive years in each of three

---

[1]  During this time the United States Fish and Wildlife Service ("Fish and Wildlife Service") considered the Northern Rocky Mountain Wolf a distinct subspecies of the gray wolf.  As more fully discussed *infra*, taxonomists have since tended to recognize fewer subspecies of wolves.

identified recovery areas (Yellowstone National Park, central Idaho and northwestern Montana).

Based on the 1987 recommendation, and at Congress' direction, the Fish and Wildlife Service, in cooperation with the National Park Service and the United States Forest Service ("Forest Service"), prepared an environmental impact statement in accordance with the National Environmental Policy Act, 43 U.S.C. § 4332(2)(C). The final environmental impact statement analyzed the environmental effects of five wolf recovery alternatives. The proposed action alternative the Fish and Wildlife Service adopted called for the annual reintroduction of fifteen wolves in two nonessential experimental population areas – Yellowstone National Park and central Idaho – beginning in 1994. Section 10(j) of the Endangered Species Act, 16 U.S.C. § 1539(j), expressly authorizes the establishment of such nonessential experimental populations.

In June 1994, Secretary Bruce Babbitt adopted the proposed action alternative subject to certain conditions intended to "minimize or avoid the environmental impacts and public concerns identified during the environmental review process." One condition was the promulgation of nonessential experimental population rules to implement a wolf management program under

section 10(j).  The Department published its final experimental population rules in November 1994.  59 Fed. Reg. 60252 (Nov. 22, 1994).  The Recovery Plan and final rules prescribe the release of 90-150 wolves from Canada into designated areas of Yellowstone and central Idaho over a three- to five-year period, *id.* at 60254-255, 60266, 60269, notwithstanding the Department's acknowledgment (1) a colony of naturally occurring wolves exists in Montana which, as the number of wolves increases, eventually will recolonize areas of Yellowstone and Idaho; and (2) lone wolves have been confirmed to exist in or near the designated experimental population areas in Yellowstone and Idaho.  The final experimental population rules expressly authorize persons coming into contact with wolves to take actions otherwise prohibited under the Endangered Species Act.  For example, a livestock producer can "take" any wolf caught in the act of killing, wounding or biting livestock on his land so long as the incident is reported within twenty-four hours.  *Id.* at 60264, 60279.  The rules also provide a framework within which the Fish and Wildlife Service can manage "problem" wolves.  *Id.* at 60265, 60279.

B.    The Parties

Appearing as Defendants/Appellants in this matter are the various governmental departments, agencies and their officials responsible for wolf and

wolf habitat management, including the Department of Interior, its agencies the Fish and Wildlife Service and National Park Service, and the Department of Agriculture and its agency the Forest Service (hereafter the "Agencies"). On appeal, the National Audubon Society, which originally appeared as a plaintiff, realigns itself and joins in the Agencies' briefs. The National Wildlife Federation, Defenders of Wildlife, Wyoming Wildlife Federation, Idaho Wildlife Federation, and the Wolf Education and Research Center appear as Intervenors on behalf of the Agencies. Collectively, these parties advocate the legal validity of the wolf reintroduction rules, and any reference to the Agencies' arguments or contentions generally reflects those of the Intervenors.

Plaintiffs/Appellees include: the Wyoming Farm Bureau Federation, the Montana Farm Bureau Federation, the Idaho Farm Bureau Federation, the American Farm Bureau Federation, James R. and Cat D. Urbigkit, the Predator Project, Sinapu, and the Gray Wolf Committee. The Urbigkits and the Predator Project also raise issues on cross-appeal. Collectively, these parties represent the educational, economic, and social interests of individuals who reside, recreate, farm, and/or ranch in or near the designated experimental population areas. All participated in the administrative proceedings related to the wolf recovery/reintroduction program. For different reasons, all dispute the legal

validity of the wolf reintroduction rules.

The following individuals and entities filed amicus briefs: the Environmental Defense Fund, World Wildlife Fund, Wildlife Conservation Society, Izaak Walton League, Idaho Conservation League, Wolf Recovery Foundation, and the Center for Marine Conservation (collectively referred to as "Environmental Defense Fund and others"); the National Parks and Conservation Association; James C. Hill; the Friends of Animals, Inc.; and the Nez Perce Tribe. With the exception of Mr. Hill and the Friends of Animals, Inc., all amicus parties support the Agencies' position. The Friends of Animals, Inc. and Mr. Hill assert issues and arguments against the wolf recovery program not previously raised or addressed by the named parties or the district court.[2]

---

[2] We note the Friends of Animals, Inc. and Mr. Hill present issues and arguments in their amici briefs. We will not consider those arguments or resolve those issues here, as the parties did not adopt them by reference, they do not involve jurisdictional questions or touch on issues of federalism or comity we might consider *sua sponte*, and we perceive no other exceptional circumstance to justify our consideration of issues raised solely by amicus. *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1403-04 (10th Cir. 1997) (court of appeals should exercise discretion to consider new issues and arguments advanced by amicus only in exceptional circumstances).

C.     Pending Motions

The parties filed a number of preliminary motions, which were referred to this panel for resolution.  We conclude none is dispositive and rule as follows: All motions to dismiss are denied.  The Agencies' motion to file missing administrative record documents is granted.  The National Audubon Society's motions to dismiss, realign, and join defendants' and amici briefs are granted. The Wyoming Farm Bureau's Second Motion to Strike is denied.  The Farm Bureaus' motion to expedite is denied as moot.

D.     The Issues

*Standing*

At the outset of litigation, the Defendant Agencies challenged the Audubon Society's and the Urbigkits' standing to bring any claims.  The Agencies also challenged the Farm Bureaus' standing to assert their Endangered Species Act and National Environmental Policy Act claims.  The district court held both the Audubon Society and the Urbigkits have standing.  *Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1361.  The court further held the Farm Bureaus lack standing to assert a National Environmental Policy Act claim.  *Id.*  The court determined, *sua sponte*, that Mountain States Legal Foundation lacks standing to pursue its action altogether.  *Id*. at 1355 n.10.  Mountain States Legal Foundation did not submit

briefs on appeal. The remaining parties do not raise the standing issue in their briefs. Accordingly, we do not address this issue, and the district court's rulings pertaining to standing remain unaffected.

*Statutory Notice and Procedural Rights*

The Agencies unsuccessfully sought dismissal of the first two counts of the Farm Bureaus' complaint for failure to provide sufficiently specific notice pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g). *Id*. at 1362-63. They do not challenge the district court's ruling on appeal; therefore, we do not address it and the district court's ruling on this issue stands.

The Farm Bureaus' contention the Agencies did not afford them certain Endangered Species Act procedural rights provided under 50 C.F.R. § 17.81(d) was similarly unsuccessful in district court. *Id*. at 1365-66. Because the Farm Bureaus do not pursue this claim on appeal, the district court's ruling stands.

*The Wolf Reintroduction Rules*

The crux of this case, and hence this opinion, is the validity of the final rules governing the introduction of a nonessential experimental population of gray wolves in the entirety of Yellowstone and in central Idaho. The district court

struck down the challenged rules as violative of section 4(f) and section 10(j) of the Endangered Species Act, 16 U.S.C. §§ 1533(f), 1539(j). *Id.* at 1373-76. However, the district court found no violation of the National Environmental Policy Act. *Id.* at 1369. We afford the district court's decision no particular deference, but rather, review the rules and administrative record independently. *See City of Albuquerque v. Browner*, 97 F.3d 415, 424 (10th Cir. 1996), *cert. denied*, 522 U.S. 965 (1997); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

## II. Legal Analysis

A.   *Standard of Review*

Our review of the rules and record is governed by the Administrative Procedure Act, 5 U.S.C. § 706. Essentially, we must determine whether the Agencies: (1) acted within the scope of their authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion. *Olenhouse*, 42 F.3d at 1574. Within this context, we will set aside the Agencies' factual determinations only if they are unsupported by substantial evidence. "The substantial-evidence standard does not allow a court to displace the [Agencies'] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had

the matter been before it *de novo.*" *Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999) (quotation marks and citations omitted).

We review matters of law *de novo*. *Id.* at 1102. When reviewing the Agencies' interpretation and implementation of the Endangered Species Act, we give strict effect to the unambiguous intent of Congress if Congress has clearly spoken to the issue before us. However, if Congress is silent on the issue and has delegated authority over the subject matter to the Agencies, we defer to the Agencies' construction, unless, in context of the Act, the Department's construction is unreasonable or impermissible. *Hoyl v. Babbitt*, 129 F.3d 1377, 1385 (10th Cir. 1997) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 845 (1984)). "[W]e must consider the language of the relevant statutory scheme as illuminated by 'the provisions of the whole law, and ... its object and policy.'" *Arco Oil & Gas Co. v. EPA*, 14 F.3d 1431 (10th Cir. 1993) (quoting *Aulston v. United States*, 915 F.2d 584, 589 (10th Cir. 1990), *cert. denied*, 500 U.S. 916 (1991)).

B.    *Statutory Context*

Congress enacted the Endangered Species Act in 1973 to "provide for the conservation, protection, restoration, and propagation of *species* of fish, wildlife,

and plants facing extinction." S. Rep. No. 93-307, at 1 (1973), *reprinted in* 1982 U.S.C.C.A.N. 2989 (emphasis added); *see also* 16 U.S.C. § 1531(b). Toward that end, the Endangered Species Act authorizes the Secretary of the Interior to list domestic or foreign species as endangered or threatened. 16 U.S.C. § 1533(a) - (b). Once a species is so listed, it is afforded certain protections, and federal agencies assume special obligations to conserve, recover and protect that species. For example, section 4(f), 16 U.S.C. § 1533(f), directs the Secretary to develop and implement recovery plans for the "conservation and survival" of listed species "unless he finds that such a plan will not promote the conservation of the species." In addition, section 7(a)(1) authorizes the Secretary to "live" trap and "transplant" (reintroduce) rare species, if necessary, to bring an endangered or threatened species to the point at which the protective measures of the Endangered Species Act are no longer necessary. *See* 16 U.S.C. §§ 1536(a)(1) and 1532(3) (definition of "conservation").

Congress added section 10(j) to the Endangered Species Act in 1982 to address the Fish and Wildlife Service's and other affected agencies' frustration over political opposition to reintroduction efforts perceived to conflict with human activity. Although the Secretary already had authority to conserve a species by introducing it in areas outside its current range, Congress hoped the

provisions of section 10(j) would mitigate industry's fears experimental populations would halt development projects, and, with the clarification of the legal responsibilities incumbent with the experimental populations, actually encourage private parties to host such populations on their lands. H.R. Rep. No. 97-567, at 8 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2808, 2817; *see also* 16 U.S.C. § 1539(j).

Section 10(j), 16 U.S.C. § 1539(j), provides:

Experimental populations

(1) For purposes of this subsection, the term *"experimental population" means any population* (including any offspring arising solely therefrom) *authorized by the Secretary for release* under paragraph (2), *but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species.*

(2)(A) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

(B) Before authorizing the release of any population under subparagraph (A), *the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species.*

(C) For the purposes of this chapter, each member of an experimental population shall be treated as a threatened species;

except that –

        (i) solely for purposes of [section 7, 16 U.S.C. § 1536] (other than subsection (a)(1) thereof), an experimental population determined under subparagraph (B) to be not essential to the continued existence of a species shall be treated, except when it occurs in an area within the National Wildlife Refuge System or the National Park System, as a species proposed to be listed under [section 4, 16 U.S.C. § 1533]; and

        (ii) critical habitat shall not be designated under this chapter for any experimental population determined under subparagraph (B) to be not essential to the continued existence of a species.

        (3) The Secretary, with respect to populations of endangered species or threatened species that the Secretary authorized, before October 13, 1982 [the date of the enactment of this subsection], for release in geographical areas separate from the other populations of such species, shall determine by regulation which of such populations are an experimental population for the purposes of this subsection and whether or not each is essential to the continued existence of an endangered species or a threatened species.

(Emphasis added).


        As the language of this provision makes clear, Congress contemplated the Secretary would promulgate special rules to identify each experimental population. As Congress explained:

        The purpose of requiring the Secretary to proceed by regulation, apart from ensuring that he will receive the benefit of public comment on such determinations, is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs of that population. Among the regulations that must be promulgated are regulations to

provide for the identification of experimental populations. Such regulations may identify a population on the basis of location, migration pattern, or any other criteria that would provide notice as to which populations of endangered or threatened species are experimental.

H.R. Conf. Rep. No. 97-835 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2875.

In other words, Congress purposely designed section 10(j) to provide the Secretary flexibility and discretion in managing the reintroduction of endangered species. By regulation, the Secretary can identify experimental populations, determine whether such populations are essential or nonessential, and, consistent with that determination, provide control mechanisms (*i.e.*, controlled takings) where the Act would not otherwise permit the exercise of such control measures against listed species.

C.    *Alleged Violations*

   1.  Geographic Separation

   The Agencies do not dispute individual wolves may leave (and, from time to time, have left) Canada and Montana and enter the experimental population areas in central Idaho and Yellowstone. The Farm Bureaus and the Urbigkits argue, and the district court agreed, that this possibility establishes an overlap of wolf "populations," or the overlap of the experimental areas and the "current range" of naturally occurring wolf populations in contravention of the

requirement in section 10(j)(1) that experimental populations of an endangered species must be wholly separate geographically from nonexperimental populations of the same species. We do not accept that contention.

Plaintiffs base their argument on a single piece of legislative history they claim demonstrates Congress never intended section 10(j) to lessen the Endangered Species Act protections afforded individual members of a natural population of a listed species, or to create law enforcement problems. *See Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1372-73. The 1982 House Report they rely on states the House Committee:

> carefully considered how to treat introduced populations that overlap, in whole or in part, natural populations of the same species. To protect natural populations and to avoid potentially complicated problems of law enforcement, the definition [of "experimental population"] is limited to those introduced populations that are wholly separate geographically from nonexperimental populations of the same species. Thus, for example, in the case of the introduction of individuals of a listed fish species into a portion of a stream where the same species already occurs, the introduced specimens would not be treated as an "experimental population" separate from the non-introduced specimens.... If an introduced population overlaps with natural populations of the same species during a portion of the year, but is wholly separate at other times, the introduced population is to be treated as an experimental population at such time as it is wholly separate. The Committee intends, however, that such a population be treated as experimental only when the times of geographic separation are reasonably predictable and not when separation occurs as a result of random and unpredictable events.

H.R. Rep. No. 97-567, at 33 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2833.

According to the Farm Bureaus, this passage "specifically prohibits the overlap of 'individuals' and/or 'specimens' of a species, not just the overlap of *entire* populations of a species," and demonstrates Congress' intent that an "experimental population" should exist "only when there is no possibility that members of the 'experimental population' could overlap with members of naturally occurring populations." They claim the Agencies erroneously fail to recognize that populations are necessarily made up of individuals; thus, the wolf reintroduction rules reflect an impermissible construction of section 10(j).

The Farm Bureaus further argue the reintroduction program creates law enforcement problems by characterizing naturally occurring individual wolves that wander into the experimental population as "experimental" rather than "endangered." According to the Farm Bureaus, naturally occurring individual wolves are entitled to full Endangered Species Act protection regardless of location, and because it is virtually impossible to differentiate between a naturally occurring wolf and a reintroduced wolf, officials will not be able to enforce those protections as Congress intended.

We begin our analysis by reviewing the statute itself, the extent to which Congress expressly defined relevant terms or otherwise clearly spoke to this issue,

and conversely, the degree to which Congress delegated authority over the matter to the Agencies, in particular the Department of Interior. *See Chevron U.S.A.*, 467 U.S. at 842-43; *see also United States v. McKittrick*, 142 F.3d 1170, 1173 (9th Cir. 1998), *cert. denied*, 119 S. Ct. 806 (1999). As the district court recognized, the Endangered Species Act does not define the relevant terms or otherwise address the precise question at issue – whether the phrase "wholly separate geographically from nonexperimental populations" means that a reintroduced population of animals must be separate from every naturally occurring individual animal. *Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1371-74. Instead, as the statutory language and legislative history make clear, Congress deliberately left the resolution of this type management/conservation issue to the Department. *See McKittrick*, 142 F.3d at 1174 ("Congress' specific purpose in enacting section 10(j) was to give greater flexibility to the Secretary. Thus, each experimental population has its own set of special rules so that the Secretary has more managerial discretion. This flexibility allows the Secretary to better conserve and recover endangered species." (Quotation marks and citations omitted.)); *see also* H.R. Rep. No. 97-567 at 33 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2833. We therefore defer to the Department's interpretation of the phrase "wholly separate geographically from nonexperimental populations," so long as its interpretation does not conflict with the plain

language of the Endangered Species Act. *See Hoyl*, 129 F.3d at 1385. We perceive no conflict.

The Department defines "population" as a potentially self-sustaining group "in common spatial arrangement,"[3] and thus determined a "geographic separation" is any area outside the area in which a particular *population* sustains itself. *See Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1373; 59 Fed. Reg. at 60256. These definitions preclude the possibility of population overlap as a result of the presence of individual dispersing wolves – by definition lone dispersers do not constitute a population or even part of a population, since they are not in "common spatial arrangement" sufficient to interbreed with other members of a population. Moreover, since it is highly unlikely a lone wolf will encounter another solitary wolf of the opposite sex and reproduce for two years running, the populations left behind by the lone wolves do not expand simply because they travel away.

---

[3] The Department generally defines "population" as "a group of fish or wildlife ... in common spatial arrangement that interbreed when mature." 50 C.F.R. § 17.3. It refined that definition in the context of the wolf reintroduction regulations to mean "at least two breeding pairs of gray wolves that each successfully raise at least two young" yearly for two consecutive years. 59 Fed. Reg. at 60256.

This interpretation of the "geographic separation" requirement of section 10(j) is consistent with the language and objectives of the Endangered Species Act as a whole. Congress defined "species," as used throughout the Act, to represent subspecies or "any distinct population segment" of an interbreeding species. 16 U.S.C. § 1532(16). This reference to species *vis à vis* populations or population segments, as opposed to individual specimens, is repeated throughout the text of section 10(j), thus reflecting the paramount objective of the Endangered Species Act to conserve and recover species, not just individual animals. *See McKittrick*, 142 F.3d at 1174 (citing H.R. Conf. Rep. No. 97-835 at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 2860, 2871). This broader objective is further evidenced by the well-established fact individual animals can and do lose Endangered Species Act protection simply by moving about the landscape.[4]

---

[4] As amici, Environmental Defense Fund and others aptly summarize:

The line dividing protected and unprotected (or differently protected) populations is sometimes an international boundary (*e.g.*, grizzly bears, which south of the US-Canada border are threatened, but north of the border are unlisted [40 Fed. Reg. 31376 (July 28, 1975), codified at 50 C.F.R. § 17.11(h) (1977)]), a state boundary (*e.g.*, brown pelicans, which west of the Mississippi-Alabama state line are listed as endangered, while east of that line are unlisted [50 Fed. Reg. 4938 (Feb. 4, 1985), codified at 50 C.F.R. § 17.11(h) (1997)]), a county boundary (*e.g.*, American alligators which were once listed as endangered everywhere other than in three Louisiana parishes [40 Fed. Reg. 44412 (Sept. 26, 1975)]), a measure of latitude (*e.g.*, bald eagles, which until 1978 were listed as endangered south of 40 degrees north latitude, while those to the north were unlisted [50

Moreover, we find nothing in the Endangered Species Act that precludes steps to

conserve a species in order to protect isolated individuals.[5]  Nor are we convinced

C.F.R. § 17.11(i)(1977), revised at 43 Fed. Reg. 6233 (Feb. 14, 1978)]), a point on the coast (*e.g.*, coho salmon, which, if they spawn south of Cape Henry Blanco in Oregon are threatened, but which, if they spawn north of the cape are unlisted [62 Fed. Reg. 24588 (May 6, 1997)]), a distance from the coastline (*e.g.*, western snowy plovers, which are threatened within 50 miles of the Pacific coast, but unlisted beyond that distance [58 Fed. Reg. 12864 (March 5, 1993)]), or even a point on a river (*e.g.*, least terns, which are endangered along the Mississippi River and its tributaries north of Baton Rouge, but south of Baton Rouge lack any ... protection [50 Fed. Reg. 21784, 21789 (May 28, 1995)]).

Indeed, the protection afforded the gray wolf itself depends on the geographic location (if an "endangered" wolf in Wisconsin crosses the border into Minnesota it becomes "threatened," and therefore has fewer Endangered Species Act protections, 43 Fed. Reg. at 9611-12, codified at 50 C.F.R. § 17.11(h)(1997)).

[5]  This conclusion represents our major departure from the district court's reasoning, and eliminates the premise on which the district court held the Department had violated its own regulations. *Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1373-74.  As explained more fully in section II.C.2 of this opinion, we hold the Department may, consistent with the plain language of section 10(j) and the context of the Endangered Species Act as a whole, treat all wolves found within the boundaries of the designated experimental population areas, including any lone dispersing wolves that may enter those areas, as nonessential experimental animals.  Moreover, we hold the district court erred to the extent it suggested there is a temporal constraint on when and how long the Department may maintain an experimental population.  While the regulations require an analysis of the degree to which experimental and natural populations might overlap at predictable periodic times in order to determine when an introduced population is experimental, they do not require experimental and natural populations be forever kept distinct.  To hold otherwise would be to undermine the recovery objective of section 10(j) altogether.  *See* 59 Fed. Reg. at 60261, 60276 (the Department designed the reintroduction program in part to expedite gray wolf recovery by encouraging interbreeding between experimental and native

the challenged rules present complicated law enforcement obstacles. The Department specifically determined "the experimental population area does not currently support any reproducing pairs of wolves;"[6] thus, the legal protection afforded any particular wolf is clearly known, depending entirely on where the wolf is, not where it might once have been. For these reasons, we hold the Department's interpretation of the "geographic separation" provision reflects the goals of the Endangered Species Act "to protect natural populations" and "to avoid potentially complicated problems of law enforcement," H. Rep. No. 97-567, 97th Cong., 2d Sess. at 33 (1982), reprinted in 1982 U.S.C.C.A.N. at 2833, and is well within the scope of agency discretion granted by Congress and licensed by the Supreme Court. *See McKittrick*, 142 F.3d at 1174-75.

Plaintiffs' argument the Agencies failed to release the Canadian wolves outside the "current range" of naturally occurring wolves is similarly flawed since Plaintiffs rigidly define "current range" as it is used in section 10(j) to be that territory occupied by an individual wolf. The plain language of the statute does not support their interpretation. Although the statute does not define "current

populations).

---

[6] 59 Fed. Reg. at 60256. We discuss and uphold this factual determination in section II.C.4.

range," section 10(j)(2)(A) requires that an "experimental population" must be established "outside the current range of such *species*." 16 U.S.C. § 1539(j)(2)(A) (emphasis added). As discussed above, Congress defined "species," consistent with its broad conservation and recovery goals, to constitute distinct, interbreeding population segments or subspecies, not individual animals. By definition, then, an individual animal does not a species, population or population segment make. Therefore, the Department, exercising its discretion under section 10(j), reasonably interpreted the phrase "current range" to be the combined scope of territories defended by the breeding pairs of an identifiable wolf pack or population.

2. Protection of Naturally Occurring Wolves

The district court determined, at the behest of the Farm Bureaus and the Predator Project, that the Department must accord full endangered species protections to any naturally occurring wolf found within the experimental areas.[7] Accordingly, the district court held the final reintroduction rules, which provide

---

[7] We note the Predator Project largely supports the government's interpretation and implementation of the Endangered Species Act through the wolf reintroduction program. Its point of contention on appeal concerns "the management of Idaho's naturally occurring wolves, and ... not ... the status of the released wolves in Idaho, and still less the treatment of released wolves in Yellowstone."

that "[a]ll wolves found in the wild within the boundaries of [the experimental areas] after the first releases will be considered nonessential experimental animals,"[8] (1) constitute a "de facto 'delisting'" of naturally occurring lone dispersers, and (2) illegally deny full Endangered Species Act protections to offspring of naturally dispersing wolves, and to offspring of naturally dispersing and introduced wolves, within the designated experimental areas. *Wyoming Farm Bureau Fed'n*, 987 F. Supp. at 1374-76. We believe this holding unnecessarily limits the administrative discretion and flexibility Congress intentionally incorporated into section 10(j), ignores biological reality, and misconstrues the larger purpose of the Endangered Species Act.

Pursuant to section 10(j)(2)(B), 16 U.S.C. § 1539(j)(2)(B), the Secretary must, prior to authorizing a release, identify by regulation the population to be deemed experimental. As discussed above, this statutory requirement confers broad discretion to the Secretary to manage *populations* to better conserve and recover endangered species. Based on the facts (1) there were no reproducing wolf pairs and no pack activity within the designated experimental areas, (2) wolves can and do roam for hundreds of miles, and (3) it would be virtually

_____

[8] 59 Fed. Reg. at 60266 (50 C.F.R. § 17.84(i)(7)(iii)); *see also id.* at 60261 (response to Comment 16).

impossible to preclude naturally occurring individual gray wolves from intermingling with the experimental population, 59 Fed. Reg. at 60256, 60261, the Secretary intentionally identified the experimental population as all wolves found within the experimental areas, including imported wolves and any lone dispersers and their offspring. The Department determined it could best manage the wolf reintroduction program to achieve species recovery in this manner. *Id.* at 60261. We find nothing in the Act that invalidates this approach by requiring the protection of individuals to the exclusion or detriment of overall species recovery, or otherwise limiting the Department's flexibility and discretion to define and manage an experimental population pursuant to section 10(j).

In particular, we do not read section 10(j)(1) to restrict the Secretary's authority to identify an experimental population solely on the basis of animal origin as opposed to geographic location. While the language of section 10(j)(1), read in isolation, might suggest an experimental population can only be comprised of those particular animals physically relocated (and any offspring arising solely therefrom), such a narrow interpretation is not supported by the provision, or the Endangered Species Act, read as a whole. Indeed, section 10(j)(1) expressly references the Secretary's broad discretion to identify and authorize the release of an experimental population under section 10(j)(2). Moreover, as illustrated

above, when drafting section 10(j) Congress deliberately provided the Secretary with the flexibility to address the specific circumstances of any given endangered population, including the authority to identify an experimental population "on the basis of *location*, migration pattern, *or any other criteria* that would provide notice as to which populations of endangered or threatened species are experimental." H.R. Conf. Rep. No. 97-835, 97th Cong., 2d Sess. at 34 (1982), reprinted in 1982 U.S.C.C.A.N. at 2875 (emphasis added). For these reasons, we interpret the plain language of section 10(j)(1) as an expression of Congress' intent to protect the Secretary's authority to designate when and where an experimental population may be established, not as a limitation on the Secretary's flexibility.

The restrictive interpretation the Predator Project and Farm Bureaus advocate could actually undermine the Department's ability to address biological reality (*i.e.*, wolves can and do roam for hundreds of miles and cannot be precluded from intermingling with the released experimental population), and thus handicap its ability to effectuate species recovery. The Endangered Species Act simply does not countenance that result. To the contrary, Congress' overriding goal in enacting the Endangered Species Act is to promote the

protection and, ultimately, the recovery of endangered and threatened species.[9]

While the protection of individual animals is one obvious means of achieving that goal, it is not the only means. It is not difficult to imagine that sound population management practices tailored to the biological circumstances of a particular species could facilitate a more effective and efficient species-wide recovery, even if the process renders some individual animals more vulnerable. However, neither Congress nor this court are equipped to make that type of species management decision. Recognizing that fact, Congress left such decisions to the Department. We conclude the Department reasonably exercised its management authority under section 10(j) in defining the experimental wolf population by location.[10]

---

[9] *See* H.R. Conf. Rep. No. 97-835, 97th Cong., 2d Sess. at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 2860, 2871 ("In enacting the Endangered Species Act, Congress recognized that individual species should not be viewed in isolation, but must be viewed in terms of their relationship to the ecosystem of which they form a constituent element. Although the regulatory mechanisms of the Act focus on species that are formally listed as endangered or threatened, *the purposes and policies of the Act are far broader than simply providing for the conservation of individual species or individual members of listed species*." (Emphasis added.)).

[10] As amici Environmental Defense Fund and others aptly point out:

> The wolf reintroduction is unusual only in that the source animals came from Canada, where the wolf is unprotected by the [Endangered Species Act]. In every other instance in which experimental populations have been established pursuant to section 10(j), the source animals were [Endangered Species Act]-protected

3. Protection of Distinct Subspecies

The Urbigkits claim on cross-appeal there exists a genetically distinct subspecies of wolf in Yellowstone and Wyoming, *Canis lupus irremotus*. They further claim the Agencies failed to adequately consider the impacts of the reintroduced "Canadian" wolves on that naturally occurring subspecies, in violation of section 7 of the Endangered Species Act, 16 U.S.C. § 1536. According to the Urbigkits, the Agencies ignored their own expert, Dr. Ron Nowak, a Fish and Wildlife Service taxonomist, who commented that "[a] big part of the conservation of a full species is to insure that its component subspecies and

individuals taken either directly from the wild or from captivity. [Delmarva fox squirrel, southern sea otter, yellowfin madtom, Colorado squawfish and woundfin, red wolf, whooping crane.] Moreover, in at least three instances, every last individual of an endangered species has been captured and placed in a captive breeding program, and some of them or their endangered progeny were later reintroduced into the wild as part of a "threatened" experimental population. [Guam rail, black-footed ferret, California condor.] Thus, in each case, the protection afforded some "endangered" individuals has been diminished. The absence of any non-endangered individuals of these (and most other) endangered species makes that a practical necessity, and one that Congress clearly understood. Moreover, that Congress intended that some individual animals could lose their former "endangered" status as a result of action taken under section 10(j) is also apparent from section 10(j)(3), 16 U.S.C. § 1539(j)(3), which authorizes the Secretary retroactively to designate previously introduced populations as "experimental" and thus to change their status – and the concomitant protection – from "endangered" to "threatened."

populations remain intact and in place," that there is a "subspecific distinction" between the original Yellowstone wolf and the reintroduced wolves, and that "[i]f there were actually a surviving population of the original Yellowstone wolf, every effort should be made to maintain its purity and to avoid bringing in other wolves." The Urbigkits contend that because the subspecies *irremotus* was originally listed in 1973 and not specifically delisted or declared extinct in 1978 when Endangered Species Act protection was extended to all wolf subspecies, *irremotus* is still a legally listed endangered species entitled to full protection under the Act, like *Canis lupus baileyi*, the Mexican wolf subspecies.[11] After careful analysis, we conclude these claims lack both factual and legal support.

---

[11] The Northern Rocky Mountain Wolf, *Canis lupus irremotus*, was listed as an endangered subspecies of gray wolf, together with three other gray wolf subspecies, in June 1973. 43 Fed. Reg. at 9607. In 1977, the Fish and Wildlife Service proposed to combine those subspecies, and instead list the entire species, *Canis lupus*, as endangered in the lower forty-eight states, except Minnesota. The proposed reclassification became final in 1978. *Id.* at 9607-08, 9610-12. The Urbigkits reason that because the *Canis lupus irremotus* subspecies was originally listed and never formally delisted, it is entitled to full Endangered Species Act protection separate and apart from the broader gray wolf recovery program. Given that premise, they further reason the reintroduction of gray wolves from Canada amounts to a de facto delisting of the *irremotus* subspecies.

The Mexican gray wolf was listed as an endangered subspecies in April 1976. (63 Fed. Reg. 1752 (January 12, 1998)). Like the *irremotus* listing, this listing was superceded by the 1978 reclassification designating the entire species of gray wolf as endangered. However, unlike *irremotus*, identifiable, captive populations of the Mexican gray wolf exist and are the subject of an independent reintroduction program in east-central Arizona and west-central New Mexico. *See* 63 Fed. Reg. 1752, 1753 (January 12, 1998); 50 C.F.R. § 17.84(k).

The Agencies decided to reintroduce gray wolves from Canada without reference to subspecific differences. They based this decision on (1) the lack of evidence any wolf population existed in the reintroduction areas at the time of reintroduction; (2) scientific evidence that most of the historically recognized subspecies of *Canis lupus* (including *irremotus*) do not warrant recognition under modern taxonomic classification methods; and (3) the likelihood that even if there had been a distinct subspecies found in the middle to northern United States, as wolves are known to disperse and interbreed over hundreds of miles, its range would have overlapped with a more northern subspecies in southwestern Canada and the border states. Accordingly, the Agencies concluded:

> The original genetic stock cannot be restored to the area, as it no longer exists. However, if taken from southwestern Canada, reintroduced wolves will be of the same genetic stock from which natural dispersers no doubt immigrated into the original Yellowstone population, the same stock as those currently recolonizing Montana and Idaho, and the same stock that likely will get to Yellowstone through natural dispersal .... In other words, since we can not bring back the Northern Rocky Mountain Wolf, regardless of whether it deserved to be a separate subspecies, we can do the next best thing and assist nature in restoring the wolf to the northern Rockies.

The factual, scientific determination that the subspecies *irremotus* no longer exists is supported by evidence in the record comparing older taxonomic studies to more recent and sophisticated studies. The more recent studies conclude there is very little differentiation between the many subspecies of gray

-32-

wolf previously recognized. This determination is further supported by a lack of physical evidence demonstrating the presence of any wolf population, let alone a genetically distinct wolf population, in either the Yellowstone or central Idaho reintroduction areas. In rebuttal, the Urbigkits proffer the statements of Dr. Nowak, who opined there is "a subspecific distinction" between the original Yellowstone wolf and the reintroduced wolves that would be worthy of protection "[i]f there were actually a surviving population of the original Yellowstone wolf." While we appreciate the relevance of Dr. Nowak's opinion on the issue of genetic variation and the importance of subspecies conservation where an identifiable subspecies exists, we fail to see how it refutes the Agencies' conclusion the subspecies *irremotus* does not exist. Applying the arbitrary and capricious standard of review, we cannot displace the Defendants' choice between two fairly conflicting views, and must defer to the agencies' view on scientific matters within their realm of expertise. *Trimmer*, 174 F.3d at 1102; *National Cattlemen's Ass'n v. EPA*, 773 F.2d 268, 271 (10th Cir. 1985). Because this is a scientific matter within the Agencies' expertise, and because there is ample evidence in the administrative record to support the Defendants' position, we uphold their subspecies conclusions.[12]

---

[12] In any event, we do not believe the Endangered Species Act mandates the protection of the *irremotus* subspecies to the exclusion of reintroducing the gray wolf species into Yellowstone and central Idaho. While the Urbigkits

4.  National Environmental Policy Act

The Urbigkits further argue on cross-appeal the district court erred in

rejecting their claim the Defendants violated the National Environmental Policy

Act by failing to adequately analyze the impacts of wolf reintroduction on

naturally occurring wolf populations, including distinct subspecies, or to

---

correctly point out the Act permits subspecific protection *vis à vis* defining
"species" broadly to include subspecies, *see* 16 U.S.C. § 1532(16), they
erroneously assert it mandates such protection.  Nowhere does the Endangered
Species Act require the Secretary to designate experimental populations at the
subspecies level.  To the contrary, section 10(j) expressly authorizes the Secretary
to make experimental population determinations at the *species* level:

>        (B)  Before authorizing the release of any population under
> subparagraph (A), the Secretary shall by regulation identify the
> population and determine, on the basis of the best available
> information, whether or not such population is essential to the
> continued existence of an endangered species or a threatened species.

16 U.S.C. § 1539(j)(2)(B).  The only legal impediment this provision creates to
the reintroduction of a listed species (or subspecies) is if there is an existing
subspecies population within the experimental area.  As discussed above, the
Agencies reasonably determined there was no such existing population.

For these same reasons, we do not believe the Agencies' actions operate as
a de facto delisting of the subspecies *irremotus*.  As discussed above, the 1978
ruling extending Endangered Species Act protections to all gray wolves does not
diminish the protection afforded a subspecies, generally, or under a section 10(j)
reintroduction program, if a subspecies population is present within the proposed
reintroduction area.  Indeed, the Fish and Wildlife Service expressly noted in the
1978 ruling it would continue to recognize "valid biological subspecies" for
purposes of research and conservation.  43 Fed. Reg. at 9610.  The fact remains,
however, the Agencies reasonably determined there is no *irremotus* population
within the designated reintroduction area.

investigate the need for additional research. Having studied the arguments and administrative record, we agree with the district court the Urbigkits' National Environmental Quality Act claims boil down to a disagreement over scientific opinions and conclusions. The fact the Urbigkits disagree with the Defendants concerning the existence of a distinct subspecies of wolf in Yellowstone National Park and the impacts of the reintroduction program on that subspecies and other naturally occurring wolves, and cite evidence in the record they believe supports their position, simply does not constitute a National Environmental Policy Act violation.

We have long acknowledged the National Environmental Policy Act "'prescribes the necessary process,'" but "'does not mandate particular results.'" *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). In other words, the Act "prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351. Accordingly, so long as the record demonstrates the Agencies took a "hard look" at the environmental consequences of the wolf reintroduction program, we will not second-guess the wisdom of their ultimate decision or conclusions concerning the need for additional research or the impacts of wolf reintroduction on naturally occurring populations or

subspecies. *See Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999).[13]

The administrative record establishes that the Agencies analyzed the alleged existence of naturally occurring wolves in the experimental population areas, studied the arguments pertaining to subspecies identification and recognition, and catalogued the research studies and scientific sources on which they relied. Because of the lack of evidence of wolf populations (pack activity) in Yellowstone or central Idaho, and the scientific evidence supporting a reduction

---

[13] The Urbigkits attempt to recharacterize their claim challenging the adequacy of the Final Environmental Impact Statement into one of statutory construction deserving of *de novo*, non-deferential review. To the extent they assert statutory construction arguments, we fully considered and addressed those arguments in the context of our discussion of the merits of their Endangered Species Act claims. As noted above, the standards under which we review National Environmental Policy Act issues are well established and embody deference to the administrative agency. Specifically,

> [i]n reviewing the adequacy of a final environmental impact statement we merely examine whether there is a reasonable, good faith, objective presentation of the topics the National Environmental Policy Act requires an environmental impact statement to cover. Our objective is not to "fly speck" the environmental impact statement, but rather, to make a pragmatic judgment whether the environmental impact statement's form, content and preparation foster both informed decision-making and informed public participation.

*Colorado Envtl. Coalition*, 185 F.3d at 1172 (alterations, quotation marks and citations omitted).

in the number of recognized subspecies, the Agencies determined to forego additional analysis of these specific issues in the Draft Environmental Impact Statement or Final Environmental Impact Statement. The Agencies further concluded that these issues, which were identified during the public scoping process, would not be impacted significantly by any of the wolf reintroduction alternatives being considered since none of the reintroduction alternatives would hinder ongoing efforts to monitor wolf activity, preclude further study of the number and distribution of wolf subspecies in North America, or otherwise negatively impact wolf research. It is apparent the Agencies based these conclusions on the reasoned opinions of and data gathered by Fish and Wildlife Service and National Park Service experts. "[A]gencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious." *Colorado Envtl. Coalition,* 185 F.3d at 1173 n.12 (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (1989)).

We appreciate that the Urbigkits patently disagree with the Agencies' conclusions concerning (1) the existence of naturally occurring wolf populations, (2) the existence of an alleged subspecies of wolf unique to Yellowstone National Park, and (3) the significance of any impact the wolf reintroduction program would have on naturally occurring wolves. We also recognize the Urbigkits cite

evidence in the administrative record they believe supports their position. However, the mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions. *See Trimmer*, 174 F.3d at 1102. The Urbigkits fail to show a lack of substantial evidence in the administrative record to support the Agencies' conclusions, or that the Final Environmental Impact Statement was otherwise inadequate to foster informed public participation or informed decision-making. Consequently, we hold the Agencies did not violate the National Environmental Policy Act.

## III. Conclusion

After setting aside the final wolf reintroduction rules as unlawful, the district court ordered Agencies to remove all Canadian wolves and their progeny from both experimental population areas. The Predator Project, Sinapu and the Gray Wolf Committee argue on appeal this remedy is inappropriate and represents an abuse of the district court's discretion. Because we uphold the challenged wolf reintroduction rules as lawful under the Endangered Species Act and the National Environmental Policy Act, we need not address the propriety of the district court's remedy. We **REVERSE** the order and judgment of the district court, **VACATE** the district court's stay order, and **REMAND** with instructions to the district court to enter an order upholding the challenged wolf reintroduction

rules.