**DEFENDERS OF WILDLIFE,**
et al., Plaintiffs,

v.

**Benjamin TUGGLE, Director, Region 2, United States Fish and Wildlife Service, et al., Defendant.**

**WildEarth Guardians and the Rewilding Institute,**
Plaintiff,

v.

**United States Fish and Wildlife Service, and United States Forest Service, Defendants.**

**Nos. CV 08–280 TUC DCB,
CV 08–820 PHX DCB.**

United States District Court,
D. Arizona.

March 31, 2009.

Brian Segee, Defenders of Wildlife, Washington, DC, Matthew Gilbert Kenna, Western Environmental Law Ctr., Durango, CO, James Jay Tutchton, Wild Earth Guardians, University of Denver College of Law, Denver, CO, Melissa A. Hailey, Wild Earth Guardians, Santa Fe, NM, for Plaintiffs.

Erik E. Petersen, US DOJ, Washington, DC, for Defendants.

## ORDER

DAVID C. BURY, District Judge.

Plaintiffs, WildEarth Guardians and the Rewilding Institute (Guardians) and the Defenders of Wildlife (Defenders) challenge procedures for wolf control actions taken as part of the administration of the Mexican wolf reintroduction project within the Blue Range Recovery Area (BRWRA) by the United States Fish and Wildlife Service (USFWS [1]) and others. Defenders' Amended Complaint, claims one through four, allege NEPA and ESA viola-

---

1. USFWS is interchangeably referred to as the Service. Individuals are named in their official capacity with the United States Department of Fish and Wildlife Services, Unit-

ed States Department of Interior and United States Forest Service. USFWS as used in this Order refers to Defendants collectively.

tions based on USFWS' adoption of a Memorandum of Understanding in 2003(MOU) and issuance of Standard Operating Procedure 13 (SOP 13). Guardians' Complaint, claim one, also challenges the 2003 MOU and SOP 13.

USFWS filed Motions to Dismiss these claims for lack of jurisdiction because Plaintiffs rely on the judicial review provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 704, 706, which limit review to a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. USFWS argues that neither the MOU nor SOP 13 was a final agency action.

The Court finds SOP 13 crystalized final agency action begun with the adoption of the 2003 MOU and denies the Motion to Dismiss Defenders' claims one through four and Guardians' claim one. Plaintiffs may proceed under the APA.

Defenders Amended Complaint also alleges a fifth claim for violations of ESA section 4(d) because the Final Rule for relocation of the Mexican wolf does not promote conservation of the species under the taking provisions adopted by USFWS in the 2003 MOU and SOP 13. Claim five is based on ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(C), which authorizes suits against the Secretary for failing to perform a non-discretionary act or duty under § 1533 of ESA. In its Reply to USFWS' Motion to Dismiss, Guardians argue that its first claim may also be based on ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), which authorizes a person to sue to *enjoin* violations of any provision of ESA or regulation issued to implement ESA. Guardians argue that with the adoption of SOP 13, USFWS is in violation of its mandatory duty under section 10(j) of ESA to reintroduce species like the Mexican wolf "if it determines that such release will further the conservation of such species." Guardians argue that under SOP

13, USFWS completely fails to perform its mandatory duty to conserve the species.

USFWS argues Defenders' citizen suit claim must be dismissed because there is no rule under ESA section 4(d), a prerequisite for a citizen suit under 16 U.S.C. § 1540(g)(1)(C). USFWS argues Guardians' citizen suit must be dismissed because it is a programmatic challenge which is impermissible. For other reasons not argued by USFWS, the Court grants the motion as to Defenders fifth claim, but denies it as to Guardians' claim one. Defenders and Guardians may proceed under the ESA citizen suit provision 16 U.S.C. § 1540(g)(1)(A).

### *The Administrative Procedures Act (APA): Standard and Scope of Review*

■ Federal courts have limited jurisdiction, possessing only the power authorized by the Constitution and statute. It is presumed that a cause of action lies outside this limited jurisdiction and the burden of establishing the contrary rests on the party asserting jurisdiction. *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

■ The APA does not create subject matter jurisdiction, but it does provide a generic cause of action for people aggrieved by agency action, *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), which waives federal sovereign immunity, allowing a plaintiff to obtain judicial review where a statute does not provide for a private right of action. 5 §§ 701–706; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882–883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The APA "creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Natural Res. Defense Council, Inc. v. Sec. & Exchange Commission*, 606 F.2d 1031, 1043 (D.C.Cir.1979).

■ As long as the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court will uphold the administrative action. *Baltimore Gas & Electric Comp. v. Natural Resources Defense Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The courts only ask whether the agency action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under § 706(2), the Court will hold unlawful and set aside such agency action.

■ A court may also compel agency action that has been unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). This permits the courts to review agency inaction, when an agency fails to act in accordance with its statutory duties; only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take. *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). In other words, under § 706(1), an agency's failure to act constitutes agency action subject to judicial review only if the agency failed to perform a legally required, non-discretionary duty.

■ The APA authorizes lawsuits by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The standard of review is applicable to all ESA claims, including those brought under its citizen suit provisions because ESA, like NEPA, contains no statutory mandated standard. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205

(9th Cir.2004) (claims brought under ESA are governed by APA arbitrary and capricious standard of review). The deferential standard of review and the final agency action requirements protect agencies from undue judicial interference with their lawful discretion and avoid judicial entanglement in abstract policy disagreements which courts lack the expertise and information to resolve. *SUWA*, 542 U.S. at 66, 124 S.Ct. 2373; *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir.2007).

■ In the Ninth Circuit, agency action is final: 1) if it marks the consummation of the agency's decisionmaking process and 2) if it is one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Oregon Nat. Desert Ass'n. v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir.2006); *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154.

■ The finality requirement is interpreted in a pragmatic and flexible manner. *Oregon Nat'l Desert*, 465 F.3d at 982. Plaintiffs have the burden of identifying specific federal conduct and explaining how it is "final agency action," *Lujan*, 497 U.S. at 882, 110 S.Ct. 3177, and identifying a discrete agency action that the federal agency was legally required to take but failed to do so, *SUWA*, 542 U.S. at 64, 124 S.Ct. 2373.

*Background: Reintroduction of Mexican Wolf under Endangered Species Act (ESA)*

On January 12, 1998, USFWS issued a Final Rule that it would reintroduce the endangered Mexican wolf [2] into the

---

**2.** The Mexican wolf is a subspecies of an endangered gray wolf that was extirpated

BRWRA, which covers the entire Apache and Gila National Forests in east-central Arizona and west-central New Mexico. Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico (Final Rule), 63 Fed. Reg. 1752 (January 12, 1998) (codified at 50 C.F.R. 17.84(k)). The Service classified the wolf as a nonessential experimental population, subject to release under the Endangered Species Act (ESA), section 10(j). *Id.*

Section 10(j) was added to ESA in 1982 to address federal agencies' frustration over political opposition to reintroduction efforts being taken under ESA provisions that protect a species once it is listed as endangered or threatened. Specifically, ESA requires the Secretary of the Department of Interior to develop and implement recovery plans for the conservation and survival of listed species unless he finds that such a plan will not promote the conservation of a species. 16 U.S.C. § 1533(f). ESA authorizes the Secretary to "live" trap and transplant (reintroduce) rare species, if necessary, to bring an endangered or threatened species to the point at which protection under ESA is no longer necessary. 16 U.S.C. § 1536(a)(1); 16 U.S.C. § 1532(3). Section 10(j) mitigated perceived conflicts with human activity from reintroduction of endangered or threatened species by clarifying and limiting ESA responsibilities incumbent with experimental populations in the hope of encouraging private parties to host experimental populations like the Mexican wolf. *See Wyoming Farm Bureau Federation et al. v. Babbitt,* 199 F.3d 1224, 1231–1233

(10th Cir.2000) (discussing wolf reintroduction program, ESA, and 10(j) provisions).

Under section 10(j) an "experimental" population is any population authorized by the Secretary for release as an endangered species or a threatened species outside the current range of that species, 16 U.S.C. § 1539(j)(2)(A), when the population is wholly separate geographically from nonexperimental populations of the same species, 16 § 1539(j)(1). "Before authorizing release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species." 16 U.S.C. § 1539(j)(B). An experimental population shall be treated as a threatened species, 16 U.S.C. § 1539(j)(C), and if not essential, the species shall be treated as a species proposed to be listed. By statute critical habitat need not be designated, 16 U.S.C. § 1539(j)(C)(ii), and "[b]y regulation, the Secretary can identify experimental populations, determine whether such populations are essential or nonessential, and, consistent with that determination, provide control mechanisms (*i.e.,* controlled takings[3]) where the Act would not otherwise permit the exercise of such control measures against listed species." *Wyoming Farm Bureau Federation,* 199 F.3d at 1233.

"As the language of this provision makes clear, Congress contemplated the Secretary would promulgate special rules to identify each experimental population."

from the southwestern United States by 1970. 63 Fed. Reg. at 1752.

**3.** " 'Take' or 'taking' mean to capture, collect, destroy, harm, hunt, kill, pursue, shoot, trap, snare, net, possess, transport, remove, sell or offer for sale, export or import or to attempt to engage in any such conduct or any act of assistance to any other person in taking or attempting to take such native wildlife and native plants whether or not such act results in capture or collection." 26 U.S.C. § 304(11).

*Wyoming Farm Bureau Federation*, 199 F.3d at 1232. As Congress explained:

> The purpose of requiring the Secretary to proceed by regulation, apart from ensuring that he will receive the benefit of public comment on such determinations, is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs of that population. . . .

*Id.* at 1232 (citing H.R. Conf. Rep. No. 97–835 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2875).

Following this statutory scheme, USFWS issued the Final Environmental Impact Statement (FEIS) for the Mexican Wolf Reintroduction Plan on April 3, 1997,[4] and on January 12, 1998,[5] promulgated the special rule under section 10(j), Final Rule: Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico. Both the FEIS and the Final Rule were designed with "considerable management flexibility . . . to reduce potential conflicts between wolves and the activities of governmental agencies, livestock operators, hunters, and others." Final Rule, 63 Fed. Reg. at 1755; (FEIS at 2–16).

The FEIS envisioned a cooperative reintroduction program, with USFWS being the lead agency in cooperation with other federal agencies, states, and counties. "They [would] have authority under a Mexican Wolf Experimental Population Rule to actively manage the wolves, including preventing dispersal outside the designated wolf recovery areas and moving or removing any wolves causing significant conflicts." (FEIS at Abstract.)

The FEIS based its impact assessment on a post-release interagency cooperative management plan, with a management team representing USFWS, state Game and Fish agencies, and other cooperating agencies, to determine whether particular actions are necessary, with the interagency cooperative management plan covering all management issues including depredation control, capture, relocation, and removal. (FEIS at 2–16.)

*Final Rule*[6]: *50 C.F.R. § 17.84(k)*

"The final rule sets forth management directives and provides for limited allowable legal take of wolves within a defined Mexican Wolf Experimental Population Area." Final Rule, 63 Fed. Reg. at 1752. The nonessential experimental designation enabled USFWS to develop measures for management of the population that would be less restrictive than the mandatory prohibitions protecting species with "endangered status," including allowing limited "take" of individual wolves under narrowly defined circumstances. This management flexibility was necessary to make reintroduction compatible with current and planned human activities, such as livestock grazing and hunting and was critical to obtaining needed State, Tribal, local, and private cooperation, which USFWS believed would improve the likelihood of success for the reintroduction plan. *Id.* at 1754.

The issues of "allowable take and harassment of wolves," "livestock depredation," and "depredation control," were ad-

---

4. (Defenders' Response, Ex. A: Final Environmental Impact Statement, Reintroduction of the Mexican Wolf Within Its Historic Range in the Southwestern United States (FEIS)); *see also* 62 Fed. Reg. 15915, 5916 (April 3, 1997) (noticing the Department of the Interior's Decision selecting the Preferred Alternative (Alternative A) in the FEIS for implementation).

5. Final Rule, 63 Fed. Reg. 1752 (January 12, 1998).

6. *See* n. 6.

dressed in the "comments" to the Final Rule.

Comments regarding taking and harassing wolves included the following: 1) the level of legal protection of the wolves was too low; 2) wolves that eat livestock should not be killed, but only removed from the area; 3) USFWS was too willing to kill or move wolves that threaten livestock or leave the recovery area; 4) the provisions to kill and harass wolves for protection of humans and livestock would be abused and the number of breeding pairs required before this would be allowed was too low, and 5) harassing and killing wolves on public lands should not be allowed. *Id.* at 1758–59.

USFWS responded that under the rule there were narrowly defined exceptions for killing wolves and violations would subject offenders to severe penalties. *Id.* at 1758. "Nonlethal control methods will be preferred and encouraged. Depredating wolves taken alive would generally be translocated to an area where they were less likely to depredate or put back into the captive population. Euthanasia is a last resort." *Id.*

While USFWS anticipated some level of abuse of provisions for taking wolves, it believed that public education and strong law enforcement would keep abuse levels low. "The provisions on allowable take and harassment of wolves [were] narrowly drawn so that they are only to be used in ways that enhance wolf recovery, i.e., by removing depredating wolves and by conditioning wolves to generally avoid humans and livestock." *Id.*

USFWS said that before wolves would be killed on public lands for depredation, six breeding pairs would be established. "The number of wolves killed under this provision is expected to be very few, if any, and of minor consequence to the progress of wolf recovery once the prescribed num-

ber of pairs has been reached." *Id.* at 1758–59.

To comments that the provisions allowing take of wolves that attack livestock were too broad and allowances for taking nuisance wolves and using lethal methods were too vague, USFWS responded that the provisions in the rule were reasonable and would be administered with appropriate discretion so as not to impede wolf recovery. "Protocols for various management measures, such as grounds and procedures for permit issuance for the taking of wolves and the use of lethal methods, [would] be spelled out in greater detail in the *Service-approved management plan* referenced in this rule." *Id.* at 1759 (*emphasis added*).

The Final Rule, codified at 50 C.F.R. § 17.84(k), defines "problem wolves" as meaning wolves that: (1) have depredated lawfully present domestic livestock, (2) are members of a group or pack ... that were *directly involved in livestock depredations,* (3) were fed by or are dependent upon adults involved with livestock depredations (because young animals will likely acquire the pack's livestock depredation habits), (4) have depredated domestic animals other than livestock on private or tribal lands, two times in an area within one year, or (5) are habituated to humans, human residences or other facilities. 50 C.F.R. at § 17.84(k)(15).

Depredation is the confirmed killing or wounding of lawfully present domestic livestock by one or more wolves. The Service, U.S. Department of Agriculture—Wildlife Services (USWS), or other Service-authorized agencies will confirm cases of wolf depredation on domestic livestock. *Id.*

"No person, agency, or organization may 'take' any wolf in the wild, except as provided in the Rule." *Id.* at (k)(3). "Intentional taking of any wolf ..., except as described in the Rule, is prohibited." *Id.*

at (k)(3)(xiii). An unavoidable and unintentional take is not a violation. *Id.* at (k)(3)(i). Killing a wolf in self defense, or defense of the lives of others, is not a violation. *Id.* at (k)(3)(xii).

Livestock owners on private land or tribal reservation land may take (including killing or injuring) any wolf actually "engaged in the act of killing, wounding, or biting livestock" provided that evidence of livestock freshly wounded or killed by wolves is present. *Id.* at (k)(3)(v), (vi).

On public lands a permit must be issued for livestock owners to take wolves actually engaged in the act of killing, wounding, or biting livestock. Before a permit will be issued the following conditions must be met: livestock must be legally present on the grazing allotment, six or more breeding pairs of Mexican wolves must be present in the BRWRA, previous loss or injury of livestock on the grazing allotment caused by wolves must be documented by the USFWS or USFWS's authorized agent, and agency efforts to resolve the problem must be completed. The Permit is valid for 45 days or less and will specify the maximum number of wolves allowed to be taken. If taken under such a permit, evidence of livestock freshly wounded or killed by wolves must be present. The take must be reported to the USFWS' Recovery Coordinator or a designated representative of the USFWS within 24 hours. *Id.* at (k)(3)(viii).

"Personnel authorized by the Service may take any Mexican wolf ... in a manner consistent with a *Service-approved management plan,* special management measure, or a valid permit issued by the Service under § 17.32." This includes, but is not limited to: wolves that: prey on livestock, attack pets or domestic animals other than livestock on private or tribal land; impact game populations in ways

which may inhibit further wolf recovery; prey on members of the desert bighorn sheep herd found in the White Sands Missile Range and San Andres National Wildlife Refuge; are considered "problem wolves;" are a nuisance; endanger themselves by their presence in a military impact area; need aid or veterinary care; or are necessary for authorized scientific research or management purposes. "Lethal methods of take may be used when reasonable attempts to capture wolves alive fail and when the Service determines that immediate removal of a particular wolf or wolves from the wild is necessary." *Id.* (*emphasis added* ).

"The disposition of all wolves (live or dead) or their parts taken as part of a Service-authorized management activity must follow provisions in Service-approved management plans or interagency agreements or procedures approved by the Service on a case-by-case basis." *Id.* at (k)(3)(ix) (*emphasis added* ).

Both the FEIS and the Final Rule envisioned interagency cooperation in the implementation of the wolf reintroduction plan. (FEIS at 2–16); Final Rule, 63 Fed. Reg. at 1759, 1760. Both called for adaptive programs, with annual reviews and for USFWS to undertake "full" evaluations of the program after three and five years to determine whether the reintroduction plan should be continued, modified or terminated. (FEIS at 2–11); Final Rule, 63 Fed. Reg. at 1754.

### The Interagency Management Plan (IMP) [7]

In 1998, the Service approved the Mexican Wolf Interagency Management Plan (IMP), in cooperation with Arizona Game and Fish (AGFD), New Mexico Department of Fish and Game (NMFG), Forest Service (USFS), several counties, and the San Carlos and White Mountain Apache

---

7. (Defenders' Response, Ex. B: 1998 IMP)

Tribes (WMAT). The IMP "outlines the interagency management activities needed to reintroduce Mexican wolves (*Canis lupus bailey*) in the Blue Range Wolf Recovery Area (BRWRA),...." The IMP "is distributed to all personnel participating in the Mexican wolf reintroduction program to assist in coordinating interagency efforts." (IMP at 1.)

The IMP implements section (3)(ix) of the Final Rule, relating to the management plan in terms of authorizing personnel to take wolves in the experimental population: "Personnel authorized by the Service may take any Mexican wolf in the nonessential experimental population in a manner consistent with a *Service-approved management plan,* special management measure, or a valid permit issued by the Service under section 17.32." *Id.* (citing Final Rule, 63 Fed. Reg. at 1764) (emphasis added). In other words, the IMP is the "Service-approved management plan," required by the Final Rule to refine wolf management issues to spell out in greater detail wolf management protocols, including "flushing out" depredation control measures.

The IMP expanded the Final Rule's definition for problem wolves to include "other" problem criteria: 1) whether there are wounded livestock or remains of a carcass present with clear evidence that wolves were responsible; 2) intentional feeding or attracting wolves must not have occurred; 3) on public lands depredation may be excused during certain times of the year and in areas critically important to wolves survival such as near den locations from March 1 to June 30 or rendezvous sites from June 1 to September 30, and 4) the number of times and severity of depredation may also be considered. *Id.* at 16.

The IMP included protocols for conducting wolf control actions when depredations on lawfully present livestock are determined to be a problem under IMP criteria or a nuisance and providing that control actions be initiated as follows: (1) release on-site or nearby and initiation of management actions to reduce the probability of recurring depredations, (2) relocation within the recovery area, (3) removal from the wild followed by aversive conditioning and relocation within the recovery area, (4) removal from the wild population and placement in captivity or euthanizing, or (5) other appropriate actions as determined by the USFWS Mexican Wolf Recovery Leader or his designee, in consultation with the IFT (if time allows). *Id.* at 17.

If efforts to live-capture problem or nuisance wolves are unsuccessful and depredations continue, lethal control may be used in consultation with and following a decision by the USFWS Mexican Wolf Recovery Leader or his designee. The USFWS Mexican Wolf Recovery Leader or his designee, in consultation with the IFT (if time allows), will make a decision on the disposition of a problem or nuisance wolf no later than 24 hours following its capture. Prior to relocation, the IFT will consult with the involved land management agency and potentially affected permittees (if time allows) to determine the best relocation site within the recovery area and to coordinate activities. While not expected to occur, wolves that present a human safety hazard will be promptly removed from the wild or euthanized. *Id.*

Under the IMP, disposition of a problem or nuisance wolf is a discretionary call by the USFWS Mexican Wolf Recovery Leader or his designee, based on the wolf's sex, age, reproductive status, the status of wolf recovery in the recovery area, the number and seriousness of the offense, and whether it occurred in the primary or secondary recovery zone. Generally, permanent removal from the wild or euthanizing wolves will be a last resort, used only for wolves "exhibiting a consistent pattern of live-

stock depredation" (three or more confirmed kills within one year in primary wolf recovery zones or two or more in other areas). "A wolf will be euthanized only after a determination by the USFWS Mexican Wolf Recovery Leader or his designee that it had no further value to the recovery program." *Id.* at 18.

Specifically, the IMP provided:

After two confirmed incidents within one year of nuisance behavior or the killing or injuring of pets or other domestic animals on private lands by a wolf, the IFT will try to deter this behavior. The IFT will move any captured offending wolves to a distant location in the recovery area, except that pregnant or lactating females may be released on-site or nearby. The IFT will permanently remove from the wild or euthanize any wolves exhibiting a consistent pattern of nuisance behavior (three or more incidents per year).

In the early phase of recovery (five or fewer packs), management-induced mortality, particularly to females, should be minimized. Management-induced mortality in the later phases of recovery (six or more packs) becomes less critical to the successful recovery of the Mexican Wolf.

Attempts should be made to keep alpha females, females with young, or females showing signs of lactation in the population. Thus, females with young-of-the-year may not be controlled before their second or third (depending on the recovery zone or other circumstances) confirmed livestock depredation in the early stages of recovery. Also, during the later stages of recovery (five or more

packs), when other adults are removed· from the population, females with young may be released or not controlled.

Decisions to relocate or remove a wolf or wolves from the wild population will be based on criteria such as the number of established packs in the recovery area, the sex, age, and reproductive status of the animal(s), and other circumstances relevant to the specific situation. Consistent with the above guidelines, relocation or on-site release (rather than removal) will be favored in the early phases of recovery. These animals represent the seed stock upon which recovery depends. Their retention in the population will facilitate population expansion.

*Id.* at 18–19.[8]

Under the IMP, "handling and management of Mexican wolves must be done under the authorization of the USFWS Regional Director's Mexican Wolf Endangered Species Permit." A subpermit under that Permit is issued to and administered by the USFWS's Mexican Wolf Recovery Leader. In addition to the Recovery Leader, and any other USFWS or cooperating agency staff or contractors separately authorized by the Recovery Leader, the only personnel authorized to carry out the handling and management of Mexican wolves allowed under that Permit are the members of the three-person Mexican Wolf Interagency Field Team (IFT): USFWS Mexican Wolf Biologist, with oversight responsibility for the IFT to implement management and monitoring activities in the field; Arizona Game and Fish Department (AGFD) Mexican Wolf Biologist, responsible for

---

**8.** The provisions in the IMP correlate to the FEIS model for active, professional, management of depredating wolves calling for USFWS to permanently remove wolves exhibiting a consistent pattern of livestock depredation (three or more confirmed kills within one year in primary wolf recovery zones and two or more in other areas), and on private property to remove wolves exhibiting a consistent pattern of nuisance behavior (three or more incidents per year). (FEIS at 2–16.)

implementing the program in Arizona, and USWS Wolf Management Specialist, responsible for all activities related to human/wolf conflicts. *Id.*

Under the IMP, "**All decisions regarding the capture, relocation, or lethal taking of wolves will be made by the Mexican Wolf Recovery Leader,** or the USFWS Mexican Wolf Biologist in his absence, and carried out by authorized personnel under their direction or oversight." *Id.* at 5 (*emphasis in original*).

In emergency situations when neither the USFWS Recovery Leader or Biologist are available, such decisions for action involving livestock depredations or problem or nuisance wolves will be made by the USWS Wolf Management Specialist or, in his absence, by the AGFD Mexican Wolf Biologist. The latter will inform the USFWS Mexican Wolf Recovery Leader and the Wolf Biologist of such management decisions and actions as soon as possible. "**In the absence of these designees, no wolves may be intentionally taken,** except for in those circumstances specifically authorized in the Final Rule for harassment, under section 4(ii); killing or injuring wolves actually engaged in the attack of livestock, under sections 3(v), 3(vi) and (3)(vii); and taking a wolf in the defense of human life, under section 3(xii)." *Id.* (*emphasis in original*).

Under the IMP, the lead agency is the USFWS, and its Mexican Wolf Recovery Leader, who is responsible for recovery planning, captive management, administrative budget, public education and outreach, and reintroduction. *Id.* at Figure 1. The reintroduction program is implemented by the IFT, under the leadership of the USFWS Biologist, who is responsible for local outreach, control and management, monitoring, and research. The cooperat-

ing agencies form the Interagency Management Advisory Group (IMAG), with designated representatives from: Apache County, AGFD, Catron County, Grant County, New Mexico Department of Agriculture (NMDA), NMFG, San Carlos Apache Tribe, Sierra County, USWS, USFS—Apache–Sitgreaves National Forest, USFS—Gila National Forest, USFWS, and the White Mountain Apache Tribe (WMAT). (IMP at 4.) The role of the IMAG is to develop, implement, and participate in the annual review and revision, if necessary, of the IMP. *Id.* at 1–2.

The IMP complies with provisions in the Final Rule and the FEIS, earlier agreements and MOUs and any additional MOU's or agreements negotiated in the future must be consistent with it. *Id.* at 1, 8. The IMP was formally approved by the USFWS on March 27, 1998, for use by all agencies and personnel involved with the Mexican Wolf Recovery Program, "until this Plan is next revised." *Id.* at Approval Page.

The Final Rule provided very narrow criteria for allowed takings of Mexican wolves and required a "Service-approved management plan" to flush out in detail the wolf management measures, protocols, and procedures, including section (3)(ix) authorizations of personnel to take problem or nuisance wolves. In 1998, the Service approved the management plan: the IMP.

In its Motions to Dismiss, USFWS ignores the IMP and argues that "consistent with the FEIS and the Final Rule's contemplated approach for a cooperative interagency management plan, the Service entered into a Memorandum of Understanding (MOU) with various federal, state, local and tribal entities on October 31, 2003." (USFWS MD Defenders at 7.)[9]

---

**9.** USFWS refers to the FEIS, which relied on post-release management, pursuant to an interagency cooperative management plan, with a management team representing

In its Reply, the USFWS argues that "the MOU in 2003 is merely the most recent IMP." (USFWS Reply Defenders at 1.) This is a potentially self-defeating argument because the IMP was the consummation of the Service's decisionmaking process regarding wolf management practices, including depredation control measures. The Reply is equally problematic because the 2003 MOU specifically states that the parties agree to implement the Wolf recovery project, "(subject to guidance by USFWS, Region 2 Regional Director-approved recovery protocols, the objectives and strategies of the USFWS ..., the FEIS, *and the 1998 Mexican Wolf Interagency Management Plan* (or any subsequent revisions))." (USFWS MD Defenders, Ex. 1: MOU at 7) (*emphasis added*). Assuming, the 1998 IMP remains the "Service-approved management plan," required by the Final Rule, 50 C.F.R. 17.84(k), subsection (3)(ix), for authorizing personnel to take problem or nuisance wolves, the 2003 MOU must be guided by the recovery protocols, objectives and strategies in the service-approved IMP, not the other way around.

This would be consistent with USFWS' argument that this Court lacks subject matter jurisdiction under the APA over Defenders' claims one through four and Guardians' claim one because the 2003 MOU is "merely an agreement that establishes a framework for the adaptive management of the [experimental, nonessential, Mexican wolf] population," (USFWS MD Defenders at 14), which *continues* long-term efforts to reestablish Mexican

wolves in the BRWRA and not the consummation of any USFWS' decisionmaking process, *id.* (citing MOU at 2); it is not an action that determines any "rights or obligations," nor an action from which legal consequences flow because the MOU is non-binding on any party, *id.* at 15 (citing MOU at 12–13). In other words, the 2003 MOU must be guided by the recovery protocols, objectives and strategies in the Service-approved IMP, but the 2003 MOU is not guided by the IMP. Admittedly, wolf control actions are guided by SOP 13.

### The 2003 Memorandum of Understanding (MOU) [10]

The 2003 MOU followed the USFWS' 3–year review (2002) of the reintroduction project as mandated by the Final Rule, was subsequent to an independent review by AGFD and NMFG of the USFWS' 3–year report, and resulted from their decision to "redefine their relationships and responsibilities." (MOU at 4.) The purpose of the 2003 MOU, is to "establish a framework for adaptively managing the Mexican wolf reintroduction project in and around BRWRA to contribute toward recovery, including downlisting and delisting." *Id.* at 2. Relevant, here, are the MOU objectives to: develop and implement interagency coordination and cooperation protocols, procedures, and schedules for the MOU, develop and facilitate implementation of appropriate management, monitoring, evaluation, impact assessment, mitigation, and other Project-related practices, *id.* at 2–3, by redefining the relation-

---

USFWS, state game and fish agencies, and other cooperating agencies, to determine whether particular actions are necessary, and with the interagency cooperative management plan covering all management issues including depredation control, capture, relocation, and removal. (FEIS at 2–16.) Hence, the adoption of the IMP. The Court rejects the notion expressed by Guardians that "for six

years following the release of wolves in 1998, USFWS approved no management plan solidifying when wolves would be captured and/or translocated for preying on livestock," but instead "dealt with problem wolves on a case-by-case basis and removed wolves only at its discretion." (Guardians Response at 8.)

**10.** (USFWS MD Defenders, Ex. 1: MOU.)

ships and responsibilities between the Lead Agencies, (AGFD, NMFG, USFS, USFWS, WMAT, and USWS), and their relationships with Cooperators, (counties, NMDA, and other interested parties), *id.* at 4.

In relevant part the parties agree to the following: "restructuring the roles and functions of the Lead Agencies to ensure appropriate State and Tribal participation, and recognition of State and Tribal authorities and responsibilities . . . ;" restructuring the Project's IFT response protocols, and "enhancing staff capacity, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents." *Id.* at 4–5.

The Lead Agencies agree to "use the principles of adaptive management to manage the Project and to cooperate, coordinate, and communicate with each other, all Cooperators, and other interested and affected parties, to restructure and document the adaptive management framework of the Project." *Id.* at 6. The Lead Agencies implement through the MOU the objectives and strategies of their respective Wolf Recovery Plans and the 1998 IMP. *Id.*

The Lead Agencies agree to assign one employee as a Lead Participant in an Adaptive Management Oversight Committee (AMOC), and to "afford" any and all interested parties substantive opportunities to constructively and productively participate in the Project through an Adaptive Management Work Group. *Id.* at 6.

The Cooperators, the New Mexico and Arizona counties, and NMDA will assign one elected or appointed official to participate in the Project's Adaptive Management Work Group to enhance communication and coordinate impact assessments and mitigation measures that may occur from reintroduction and recovery of the Mexican wolf. *Id.* at 11–12.

The Lead Agencies maintain IFTs, *id.* at 7, to be responsible for implementing the Project in their respective jurisdictions, with AGFD, NMDFG, and WMAT agreeing to each provide one IFT Leader, and other IFT members. The Lead Agencies and the USFS agree to provide necessary authorizations and permits on a timely basis. USWS agrees to provide federal leadership and expertise to resolve conflicts between humans and wildlife in regard to the Project and "to maintain on staff one or more wildlife depredation specialists to assist in Mexican wolf damage management, primarily livestock depredation." *Id.* at 10–11.

The IFT members are guided and directed by the IFT Leaders, but are supervised by their superior in the chain of command within their respective agency. Under guidance and direction from the Lead Agencies functioning as the Committee [AMOC], the IFTs are guided by AGFD Field Team Leader on non-Tribal land in Arizona, by WMAT Field Team Leader on WMAT land, and the NMFG Field Team Leader in New Mexico. *Id.* at 7. The IFT Leaders are responsible for planning, directing, and implementing the daily activities of the teams; drafting annual work plans, annual performance reports, and new or revised project operating procedures, subject to Committee [AMOC] approval. *Id.* at 8. Project procedures must be compatible with any guidance approved by USFWS and fully comply with applicable Federal, State, and Tribal laws, and IFT Leaders must seek assistance from USFWS Field Project Coordinator as necessary to conduct activities. *Id.*

USFWS, through its Field Project Coordinator, "provides guidance" to the Project by: a) developing appropriate guidance for the Project through a Recovery Plan, recovery protocols, and other recovery

guidelines approved by USFWS, Regional Director, Region 2; b) ensuring that the revised Recovery Plan provides specific, measurable objectives for accomplishing downlisting and delisting the gray wolf; c) completing a final draft revision of the Mexican Wolf Recovery Plan by 2004, and striving to secure USFWS approval by 2005, and d) ensuring that any USFWS, Regional Director approved guidelines or protocols pertaining to Mexican wolf recovery are communicated in timely fashion to AMOC to use in providing direction to the IFT. *Id.* at 9.

The Agreement is contingent on sufficiency of resources being available to the Lead Agencies to carry out their responsibilities and expressly provides that the responsibilities designated in the Agreement are non-binding and establish no duty or obligation on any party. The MOU did "not create or establish, any substantive or procedural right, benefit, trust responsibility, claim, cause of action enforceable at law, or equity in any administrative or judicial proceeding by a party or non-party against any party or against any employee, officer, agent, or representative of any party." The Agreement took effect on the date of the last signature and remains in effect for no more than five years, unless renewed, extended, or canceled, which may be done upon written request by any party and subsequent written concurrence of the others. Any party may withdraw with a 60–day written notice to the other parties. *Id.* at 13.

Under the MOU, the AMOC had 6 months to describe the roles, responsibilities, and processes necessary to address the involvement, participation, and duties of the Lead Agencies, Project staff; and recognized committees, work groups, or other managing bodies involved in the Project. *Id.* at 8. AMOC began issuing Standard Operating Procedures (SOPs) to guide the Project. (USFWS MD Defend-

ers AC, Ex. 3: SOP: Purpose and Content of SOPs at 1.) "The primary purpose of an SOP is to describe what to do and the order in which to do it, with pertinent background on why it must be done." *Id.*

SOP 0.0: Overview explains: "From 1998 through 2002, the Project operated under direct supervision by USFWS, acting largely through the Mexican Wolf Recovery Coordinator. Due to changes made from 2002 through 2004 to a more collaborative adaptive management effort among several agencies, with State and Tribal leadership for the Project and participation by many other agencies and organizations and the public, . . . AMOC now manages the Project, which is carried out on the ground by the IFT." (USFWS' MD Defenders, Ex. 2: SOP 0.0 at 1.) The purpose of the Project's SOPs is to delineate the "right way" to do the "right things," regardless of which IFT or AMOC members are involved. They provide "greater certainty for the agencies and the public as to how decisions will be made, and implemented." They allow for flexibility, but set a sidebar on flexibility by addressing exceptions that can be expected, and identifying how to approve significant departures (exceptions) from the procedures outlined in the SOPs. *Id.*

On December 17, 2004, SOP 2.0 was issued to establish the process for developing and approving SOPs for the Mexican Wolf Project. It explained that under the MOU, AMOC was delegated the authority to develop and approve SOPs to guide the Project cooperators, especially the IFT. (USFWS MD Defenders, Ex. 4: SOP 2.0 at 1.)

The SOPs must conform to state, federal and tribal laws and regulations, and recovery guidelines, protocols, or other directives issued or approved by USFWS. The IFT initiates and drafts the SOPs, which must be reviewed and approved "in

unison" by the AMOC. Any non-concurrence will be resolved at the lowest possible level and referred to the next higher level as necessary to resolve conflicts. *Id.* at 2.

### Standard Operating Procedure 13.0 (SOP 13) [11]

██ On April 30, 2005, AMOC issued SOP 13, which lists the criteria for determining the status of nuisance and problem wolves and for conducting wolf control actions, including permanent removal. Unlike the 2003 MOU, which expressly stated it was subject to `...` *the 1998 Mexican Wolf Interagency Management Plan* (or any subsequent revisions), SOP 13 expressly states *"it supersedes relevant sections of the 1998 Mexican Wolf Interagency Management Plan reference in the Mexican Wolf Final Rule (50 CFR 17.84(k))."* (SOP at 1.)

Like the IMP, SOP 13 lists criteria for determining the status of nuisance (nondepredating) and problem (depredating) wolves and provides the guidelines and protocols for conducting related wolf control actions. *Id.* For example, SOP 13 includes protocols for the particular task, process, or situation described as "Control of Wolves," under which the USFWS Mexican Wolf Recovery Coordinator *shall* within 24 hours of when the third livestock depredation incident occurs issue a permanent removal order. *Id.* at 10 (*emphasis added*), *compare* (IMP at 18–19) (making disposition of a problem or nuisance wolf a discretionary call by the USFWS Mexican Wolf Recovery Leader, but generally describing permanent removal for wolves "exhibiting a consistent pattern of livestock depredation (three or more confirmed kills within one year in primary wolf recovery zones or two or more in other areas))."

It seems disingenuous for USFWS to argue now that SOP 13 is not a final agency action, but is "merely a general statement of policy," that it does not serve to dictate how an individual wolf control action is to be carried out and is not the consummation of the Service's decision-making process regarding the measures, procedures, and protocols for wolf management control actions. (USFWS' MD Defenders at 11.) As its purpose was to supercede the IMP, SOP 13 can be nothing less than the IMP, which under the Final Rule was USFWS' final decisionmaking regarding the Service-approved management plan for wolf control measures.

██ SOP 13 cannot be separated from the 2003 MOU. Under the 2003 MOU, AMOC was required to develop the SOPs, including SOP 13, to guide the Mexican wolf reintroduction Project and superseded the IMP. Final agency action may result "from a series of agency pronouncements rather than a single edict." *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, n. 7 (D.C.Cir.1986). The Court finds that SOP 13 crystallized the decisionmaking process begun with the 2003 MOU and is, therefore, a final agency action within the APA's meaning. *See Barrick Goldstrike Mines Inc. v. Browner,* 215 F.3d 45, 49 (D.C.Cir.2000) (explaining that preamble to rulemaking, directives issued in form of "guidance" memo, and an enforcement letter crystalized the agency's position).

### Final Agency Action: Bennett v. Spear, 520 U.S. 154 (1997)

The seminal case, *Bennett v. Spear,* involved an action brought by ranchers and irrigation users, alleging in relevant part here, violations of ESA by USFWS's proposed use of reservoir water to protect lost river and shortnose species of sucker fish.

---

**11.** (*USFWS MD Defenders, Ex. 5: SOP 13.*)

After the Bureau of Reclamation (BOR) notified USFWS that operation of the Klamath Irrigation Project might affect two endangered species of fish, USFWS issued a Biological Opinion concluding that the long-term operation of the Klamath Irrigation Project was likely to jeopardize the species. The Biological Opinion identified a reasonable and prudent alternative of maintaining minimum water levels on certain reservoirs, and USFWS issued an Incidental Take Statement setting out this alternative operation of the Klamath Irrigation Project. The BOR notified USFWS that it would operate the irrigation project accordingly. Ranchers and irrigation users sued USFWS because their water use would be substantially reduced by the change in the operation of the Klamath Irrigation Project. The Supreme Court held that the Petitioners had standing under the APA to seek review of the Biological Opinion. The Court explained that the Biological Opinion and the accompanying Incidental Take Statement constituted final agency action for APA purposes because it altered the legal regime by which the BOR would operate the irrigation project.

In *Bennett,* the Government argued that the Biological Opinion was not final agency action because it did not conclusively determine the manner in which the water would be allocated under the irrigation project. The Court explained this confused the question of final agency action with standing questions, and that as a general matter, two conditions must be satisfied for agency action to be final: 1) the action must mark the "consummation" of the agency's decisionmaking process (it must not be of a merely tentative or interlocutory nature), and 2) the action must be one by which "rights or obligations have been determined," or "from which legal consequences will flow." *Id.* at 177–78, 117 S.Ct. 1154 (citations omitted).

The Court distinguished *Bennett* from other cases finding no final agency action where the agency's action carried no direct consequences and served more like a tentative recommendation than a final and binding determination. For example, there can be no final agency action, where the agency retains the discretion to accept or reject the challenged action. *Id.* at 178 (citations omitted).

*Fairbanks North Star Borough v. U.S. Army Corps of Engineers,* 543 F.3d 586 (9th Cir.2008), involved the Army Corps of Engineers' jurisdictional decision that Plaintiff's property contained wetlands subject to regulatory provisions forbidding any discharge of dredged or fill materials into such waters under the Clean Water Act (CWA) without securing a permit. The court reasoned this was not a final agency action under the APA because it did not impose an obligation, deny a right, or fix some legal relationship. The CWA regulations require affected parties to solicit the Corps' official position about the scope of the agency's regulatory jurisdiction, 33 C.F.R. § 331.2, so the decision delimits the stopping point of the decisionmaking process for issuance and review of jurisdictional determinations. *Fairbanks,* 543 F.3d at 592–93. The court, however, found the decision failed to satisfy the second *Bennett* prong because it was advisory; the petitioner's rights and obligations remained unchanged. The agency simply expressed its opinion as to what the law requires, without altering or otherwise fixing any legal obligations or relationships. The jurisdictional decision lacked the status of law and had no comparable legal force because any later enforcement action would hinge on liability under the CWA.

"At bottom, Fairbanks has an obligation to comply with the CWA," if its property contains wetlands it must obtain a dis-

charge permit. If not, the CWA does not require a permit. Either way, Fairbanks legal obligations arise directly from the CWA, not the issuance of the agency's jurisdictional determination. *Id.* at 595.

The court compared the agency's decision to a report by a private wetlands consultant informing Fairbanks that its property contained wetlands. *Id.* From it, there would flow no practical effect with legal consequence; it had no immediate financial impact nor profound economic consequences in the real world, nor augmented the Corps' legal authority to pursue an enforcement action. *Id.* at 596.

Here, SOP 13 is couched in terms of an operating instruction. Operating instructions issued annually to permittees who graze livestock on national forest land have been held to constitute final agency action. *Oregon Natural Desert Assoc. v. United States Forest Service,* 465 F.3d 977 (9th Cir.2006). The annual operating instructions (AOIs) are a critical instrument by which the USFS regulates grazing on national forest lands; the AOIs are the mechanism used to put the USFS's allotment management decisions into effect. The AOIs are part of the USFS's annual decisionmaking process regarding management of grazing allotments, and cannot be relegated to the insignificant role of day-to-day operational guidance. The AOI is the instrument that instructs the permit holder as to how federal law and regulatory standards apply to his grazing operation. The AOIs are not part of an interim planning process, they represent the consummation of the process and result in the imposition of enforceable rights and obligations on the permittee. *Id.* at 984–986.

The court looked at whether the AOIs met the *Bennett* test of having the status of law or comparable legal force and if immediate compliance was expected or if it had a "direct and immediate ... effect on the day-to-day business' of the subject par-

ty." *Id.* at 987 (citing *Ukiah Valley Med. Ctr. v. FTC,* 911 F.2d 261, 264 (9th Cir. 1990)).

A violation of provisions in the AOI can result in an action to cancel or modify the grazing permit. USFS argued that, therefore, the permit and not the AOI has legal force. The court found the very opposite. The enforcement action flows from the AOI violation which shows USFS expects immediate compliance with the AOI's terms. The AOIs are also used to impose standards promulgated for endangered species under ESA and are the means by which USFS brings its grazing operations into ESA compliance. Accordingly, the AOIs fix the legal relationship between USFS and the permit holders regarding responsibility for ESA compliance. Finally, the court noted that the permit allowed · grazing only after the USFS issued an AOI for an allotment, and the permit incorporated the terms of the AOI. The court held that the AOI was the last word given on a discrete, site-specific action from which binding obligations flow that have a direct and .immediate effect on the day-to-day business of the permit holders. The issuance of an AOI is final agency action subject to judicial review under APA. *Id.*

 The agency's refusal to describe an action as final is not dispositive of reviewability. *Her Majesty the Queen ex rel. Ontario v. Envtl. Prot. Agency,* 912 F.2d 1525 1531 (D.C.Cir.1990) (citing *Ciba–Geigy Corp.,* 801 F.2d at 435). The determination of whether or not there is final agency action is fact specific and must be made on a case by case basis, *Indus. Safety Equip. Ass'n v. Envt'l Prot. Agency,* 837 F.2d 1115, 1117 (D.C.Cir. 1988), depending on whether there was a consummation of the agency's decisionmaking process and whether the action

determines rights or obligations or triggers legal consequences.

Under the IMP, "all decisions regarding capture, relocation, or lethal taking of wolves" was delegated to USFWS. (IMP at 5.) Under SOP 13, AMOC has responsibility for removal decisions. (SOP 13 at 1, 5: Table 1.) Under SOP 13, the IFT no longer consists of the specialized three-man unit, USFWS Mexican Wolf Biologist, AGFD Mexican Wolf Biologist, and USWS Wolf Management Specialist, operating under the direction of USFWS Mexican Wolf Recovery Leader. Instead, all the Lead Agencies provide IFT members, operating under the direction of state and tribal game and fish departments. While USFWS provides a Wolf Field Projects Coordinator as a member to the IFT, under SOP 13, removal decisions are made by AMOC, on which USFWS has one vote.[12] (SOP 13 at 8.)

The Court rejects USFWS' argument that SOP 13 provides agency decisionmakers with discretion and does not mandate a particular course of action. This ignores SOP 13's stated purpose to establish the *outer limits* of agency discretion. Whereas, the IMP flushed out and refined specific protocols that USFWS would apply in wolf control actions and identified areas were it would exercise discretion, SOP 13 provides less provisions for exercising discretion as its stated purpose is to provide greater certainty for the agencies and the public as to how wolf control decisions will be made and implemented. In other words, one reason for superceding the

IMP with SOP 13 was to limit discretion generally, and limit it specifically as to USFWS.[13]

The 2003 MOU and SOP 13 was the consummation of USFWS' decisionmaking process to shift its responsibilities over wolf control actions, especially removal decisions, to state agencies. Culminating in SOP 13, USFWS gave its last word on the roles and relationships between the state and federal agencies in taking wolf control measures, including removal actions and the exercise of discretion.

The Court finds that the 2003 MOU and SOP 13 mark the consummation of the agency's decisionmaking process in respect to wolf control measures, which determines rights and obligations as follows: 1) It establishes specific control measure protocols and specifies when and why they are to be used. 2) SOP 13's express purpose is to set clear limitations or "outer boundaries" on discretionary program management. 3) It establishes the responsibilities of and relationships between the respective AMOC participants in a way that substantively changes the direct and discretionary responsibilities once held by USFWS under the IMP. In the same way the legal regime was altered for the Klamath Irrigation Project in *Bennett* by the Biological Opinion, the legal regime under the Final Rule was altered by SOP 13.

Here, the legal obligation flows from the Final Rule, which required USFWS to engage in a decisionmaking process to flush out management control issues in a Ser-

---

**12.** USFWS retains the approval authority over removal by lethal means. (SOP 13 at 1, § 1(c)).

**13.** Guardians refer the Court to 15 times that "shall" is used in SOP 13. *See Bennett,* 520 U.S. at 175, 117 S.Ct. 1154 (describing any contention that a provision is discretionary flies in the face of text that uses the imperative "shall"). Rather than further detail the

non-discretionary implications of the specific language used in SOP 13, the Court finds its express purpose being to establish the outer limits of discretion is sufficient evidence that it was intended to be the final word upon which the public could depend regarding removal actions, especially as to the limited exercise of any discretion that would be allowed in such actions.

vice-approved management plan. The IMP was the culmination of that decision-making process. The 2003 MOU and SOP 13 which supersede the IMP are, too.

The SOP 13 directly establishes the relationships between the parties to the 2003 MOU and their respective responsibilities and obligations in respect to ESA compliance in the same way the USFS in *Oregon Natural Desert* used the AOI's to fix the legal relationship between USFS and grazing permit holders regarding responsibility for ESA compliance. USFWS argues that any legal obligations imposed on it stem from ESA and its implementing regulations, not SOP 13, and that SOP 13 does not alter the ESA-imposed burden on the Service to further the conservation of the Mexican wolf. (USFWS MD Defenders at 13.) But, it is the delegation of these ESA responsibilities to state agencies, which is made pursuant to the 2003 MOU and SOP 13, that Plaintiffs challenge in this case.

As in *Bennett*, final agency action exists because the protocols in SOP 13 are not advisory and they are not interlocutory. They were direct and immediate. The day-to-day operation of the Mexican Wolf program related to removal decisions is being carried out under SOP 13. The "decisionmaking" authority for removal actions has been delegated to AMOC, and AMOC is currently making removal decisions related to the Mexican wolf. It is USFWS decision to transfer this authority to AMOC that the Plaintiffs challenge in this law suit. It is not relevant that USFWS' issuance of each removal permit might also be challenged for ESA compliance. In spite of the non-binding language in the 2003 MOU, this is not a case like *Fairbanks*, where the agency action can be described as advisory, which would have defeated the very purpose of SOP 13, which was to limit discretion and ensure the public how wolf control decisions will be made and implemented. USFWS re-

tains no discretionary authority under the SOP 13 protocols.

Regardless of the disclaimers, the rights and responsibilities of the parties are those spelled out in the 2003 MOU and SOP 13, just as surely as if USFWS had issued an interpretive rule covering wolf control measures.

A reviewable agency action includes an agency rule, 5 U.S.C. § 551(13), defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . ." 5 U.S.C. § 551(4). The 2003 MOU and SOP 13 constitute an agency rule under this definition, but then virtually every statement an agency may make would be a rule under 5 U.S.C. § 551(4). *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir.1983). There are, however, three kinds of agency rule distinctions important to determining reviewability under the APA: legislative rules, interpretive rules, and policy statements. *See Administrative Law and Practice*, 3 Admin. L. & Prac. § 4.22 (discussing binding effect of three types of rules).

■■■ Here, the choice is between an interpretive rule or policy statement. USFWS urges that MOU 2003 and SOP 13 is a general statement of policy, which is a statement intended to allow agencies to announce their tentative intentions for the future, without binding themselves. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C.Cir.1987). A statement is not finally determinative if the agency retains discretion and authority to change its position-even abruptly-in any specific case because a change in its policy does not effect the legal norm. *Syncor International Corp. v. Shalala*, 127 F.3d 90, 94 (D.C.Cir.1997).

■■■ An interpretive rule is issued to clarify or explain existing law or regula-

tions so as to advise the public of the agency's construction of the rules it administers. *Gunderson v. Hood,* 268 F.3d 1149, 1154 (9th Cir.2001). It "spells out a duty fairly encompassed within the regulation that the interpretation purports to construe." *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 588 (D.C.Cir. 1997). While an interpretive rule lacks the formal force of law, as a practical matter it affects the regulatory practices of an agency or the expectations of a regulated entity as to what a law or regulation means and how it will be enforced. When it has a substantial impact on the rights of individuals, its promulgation may constitute final agency action for purposes of judicial review. *Am. Postal Workers Union v. U.S. Postal Serv.,* 707 F.2d 548, 560 (D.C.Cir. 1983); *see also National Home Builders v. Norton,* 415 F.3d 8, 15 (D.C.Cir.2005).

The Court finds that unlike a general policy statement, SOP 13 was intended to ensure the public as to how wolf removal decisions would be made and to limit USFWS discretion and authority to change its position regarding wolf removal. SOP 13 was adopted to supercede the IMP, which this Court finds was an interpretive rule because the Final Rule called for USFWS to adopt such a rule when it called for detailed wolf management procedures and protocols, including control measures to be spelled out in a Service-approved management plan. The IMP, and subsequently the MOU and SOP 13, was intended to add considerable detail to 50 C.F.R. § 17.48(k) to flush out the specifics of wolf removal actions. The IMP was binding until revised, which admittedly occurred when superceded by SOP 13, making SOP 13 equally binding until revised. Because neither the IMP nor the MOU and SOP 13 were tentative declarations of how USFWS intended to enforce the Final Rule, 50 C.F.R. § 17.48(k), and ESA, both are best characterized as interpretive rules rather than general state-ments of policy. The Court finds that the 2003 MOU and SOP 13 are final agency actions, subject to review under the APA.

### The APA Claims

Defenders charge that the 2003 MOU and SOP 13 are not consistent with the "contemplated" approach mandated by the Final Rule for the Mexican wolf, the FEIS and the IMP, because the 2003 MOU delegates to AMOC USFWS's authority to develop and approve SOPs. (Defenders' Response at 6 (citing USFWS, Ex. 2: SOP 0.0 at 1) (under the MOU, approval of future SOPs is determined by a majority vote, giving USFWS only one vote out of six in administering the reintroduction effort, including AMOC's approval of SOP 13)). Additionally, the 2003 MOU and SOP 13 significantly alter USFWS's administration of the Mexican wolf reintroduction project by redefining the relationships and responsibilities between USFWS and cooperating agencies as compared to what was "contemplated" in the FEIS, the Final Rule under section 10(j), and the IMP by elevating state agencies, like AGFD, to the leadership roll over USFWS instead of being advisory. (Defenders' Response at 1, 6.)

■■■ Defenders charge that under SOP 13, "[u]nlike the FEIS, 10(j) rule, and IMP, USFWS is not permitted to consider any other circumstances—including the wolf's importance to the recovery effort or the numbers of wolves or breeding pairs remaining in the wild—before making removal decisions under SOP 13." (Defenders' Response at 6.) Defenders argue that the framework of the 2003 MOU and SOP 13 is contrary to the overriding principles of flexibility, recovery, and conservation required under the Final Rule and violates ESA. *Id.* These allegations are similar to those raised by Guardians in claim one, which charges USFWS adoption and implementation of SOP 13 does not further

the conservation of the Mexican wolf as required by ESA section 10(j). (Guardians Complaint at 18.)

Defenders charge that both the MOU and SOP 13 were implemented without changing the Final Rule or conducting a NEPA analysis. (Defenders' Response at 7.) Under NEPA, if an agency proposes any "major Federal action[ ] significantly affecting the quality of the human environment," it must prepare an FEIS to consider the environmental consequences of the proposed action. 42 U.S.C. § 4332(2)(c).

*ESA section 4(d) and ESA citizens suit provisions: 16 U.S.C. § 1540(g)(1)(A) and (C)*

Defenders also challenge, as a consequence of the 2003 MOU and SOP 13, that "management removals" of wolves dramatically increased to a point that violates USFWS's non-discretionary duty under ESA, section 4(d), to ensure that the wolf reintroduction project meets that Act's conservation mandate.

ESA contains a citizen suit provision, which allows "any person [to] commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). Section 4(d) of ESA, 16 U.S.C. § 1533(d), provides: "Whenever any species is listed as a threatened species . . ., the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species . . . ."

USFWS argues simply that: "[ ], ESA section 4(d) relates specifically to the promulgation of 'protective regulations' under ESA section 4(d). Plaintiffs have not, nor can they, point to any regulation that has been issued pursuant to ESA section 4(d) for this population of wolves. Quite simply, the Service has not issued regulations under ESA section 4(d) to govern the Mex-ican wolf." (USFWS MD Defenders at 17.) USFWS argues without this prerequisite, there can be no section 4(d) violation.

Defenders point to the issuance of the Final Rule for Reintroduction of the Mexican Wolf, issued pursuant to ESA section 10(j), which is by definition the promulgation of the protective regulations for the species pursuant to the authority of ESA section 4(d). "Any population determined [ ] to be an experimental population shall be treated as if it were listed as a threatened species for purposes of establishing protective regulations under section 4(d) . . . The Special rules (protective regulations) adopted for an experimental population [ ] will contain applicable prohibitions, as appropriate, and exceptions." 50 C.F.R. 17.82. In this way ESA sections 10(j) and 4(d) operate together to provide the flexibility of less restrictive taking prohibitions under the authority of section 4(d) for "threatened" species to be set out in the Special Rule issued for the experimental species under ESA section 10(j). Final Rule, 49 Fed. Reg. 33,885, 33,886 (August 27, 1984).

In this case, the Final Rule for the Reintroduction of the Mexican Wolf, issued under section 10(j) of the ESA, is the Special Rule issued for the species, codified as protective regulation 50 C.F.R. 17.84(k). It must contain applicable prohibitions, as appropriate, and exceptions "to provide for the conservation of the species" as required under ESA section 4(d). In other words, the Final Rule for the Mexican Wolf Reintroduction Program, must comply with ESA section 4(d)'s mandate to provide for the conservation of the species. Defenders charge that under SOP 13, the Final Rule fails to satisfy this mandate.

USFWS has discretion to issue the regulations it deems necessary and advisable, but the regulation "shall" provide for the

conservation of such species. 16 U.S.C. § 1533(d); *see Ass'n of Calif. Water Agencies v. Evans,* 386 F.3d 879, 883–84 (9th Cir.2004) (terms of § 1533 are obligatory not discretionary); *cf., Defenders of Wildlife v. United States Department of Interior,* 354 F.Supp.2d 1156, 1160 (D.Or.2005) (ESA, 16 U.S.C. § 1533(f)(1), instructs the Secretary to develop and implement plans known as "recovery plans" for the conservation and survival of endangered and threatened species; ESA § 7(a)(1), 16 U.S.C. § 1536(a)(1), imposes affirmative conservation duty on Secretary); *see also* Final Rule, 63 Fed. Reg. 1760 (explaining that if unacceptable levels of take occur, the Biological Opinion or the rule, or both, would have to be revised). For example, the Final Rule was subject to challenge, if the parties believed it failed to conserve the Mexican wolf. *See* (USFWS Reply to Guardians at 4) ("If Guardians believed certain limitations were required to conserve the Mexican wolf, like a numerical cap on removals, they should have challenged the Final Rule, . . . .")

USFWS has a non-discretionary duty to ensure that the Final Rule for the Reintroduction Program, 50 C.F.R. § 17.84(k), provides for conservation of the Mexican Wolf. Defenders sue USFWS under citizen suit provision 16 U.S.C. § 1540(g)(1)(C) for the alleged failure to perform this non-discretionary duty. Guardians make a similar claim under 16 U.S.C. § 1540(g)(1)(A), which allows a citizen to sue to enjoin any person, including the United States or any other governmental instrumentality or agency . . ., who is alleged to be in violation of any provision of

ESA or any implementing regulation of ESA. Guardians rely on the general conservation mandate of ESA section 10(j) and the specific conservation mandate in the Final Rule, 50 C.F.R. § 17.84(k). Like Defenders, Guardians allege that under SOP 13, the Final Rule no longer provides for the conservation of the Mexican Wolf and the Court must, therefore, enjoin this violation: SOP 13.

Neither of these citizen suit claims are broad programmatic attacks, which would be impermissible. *SUWA,* 542 U.S. at 66–67, 124 S.Ct. 2373 (the courts are not empowered to issue orders compelling compliance with broad statutory mandates, injecting themselves into the day-to-day management of the agency). Both of the citizen suit claims are aimed at a discrete final agency action: the adoption of SOP 13.[14]

The question, here, is whether these claims are properly brought under ESA's citizen suit provision 16 U.S.C. § 1540(g)(1), subsection (A) or (C). The Court must also determine whether any citizen suit claim duplicates any claim brought under the APA because if a citizen suit claim is available under ESA, the claim is not reviewable under the APA. *Coos County Board of County Com'rs v. Kempthorne,* 531 F.3d 792, 810 (9th Cir. 2008) (citing *Bowen v. Massachusetts,* 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)) (general grant of review in the APA not intended to duplicate existing procedures for review of agency action).

In *Coos,* the county sued USFWS for failure to publish a proposed rule delisting

---

**14.** There are no allegations in Guardians' Complaint to support the assertion in its Response that it challenges "at least 45 discrete agency actions by which USFWS implemented SOP 13." (Guardians Response at 6.) As it admits, it challenges the continued implementation of SOP 13. While the Court may need to consider the individual removals of Mexi-

can wolves made under SOP 13, it will not consider the individual removals as discrete and separate violations of ESA. As the Court finds Guardians' Complaint does not state claims challenging individual wolf control actions, it does not reach USFWS' argument that Plaintiff Guardians does not have standing to bring such claims.

the tri-state murrelets after USFWS' five year review determined the murrelets were not a distinct population segment. The county argued this decision triggered USFWS mandatory duty to delist the species, even though USFWS had determined the listing status should not be changed. The county argued the delisting process was governed by deadlines normally associated with citizen petitions to delist species and sued USFWS for failing to timely delist the murrelets. The court concluded that the deadlines applicable to citizen petitions to delist a species did not apply to such decisions initiated by USFWS. More importantly, the court held that the county could not proceed under either ESA citizen suit provision 1540(g)(1)(C) or APA 706(1), which both require the failure to perform some discrete nondiscretionary act. "[The] "failure to act" inquiry necessarily depends upon the determination USFWS made; it does not go behind the determination to inquire whether it should have been made differently." *Id.* at 803.

"The ESA and APA provisions under which Coos County brought suit allow challenges to FWS's alleged failure to act, not to the substantive content of its actions. This principle is entirely clear in the 5 U.S.C. § 706(1) context and, as § 1540(g)(1)(C) likewise concerns failures to act, it is necessarily also so limited." *Coos,* at 810–811 (citing *see, e.g., Bennett,* 520 U.S. at 171–72, 117 S.Ct. 1154 (explaining that § 1540(g)(1)(C) may be used to challenge "the omission of . . . required procedures"); *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States,* 384 F.3d 721, 728 (9th Cir.2004) ("[Section] 706(1) generally only allows the district

court to compel an agency to take action, rather than compel a certain result, when action is unlawfully withheld.")). "So, in considering whether FWS has fulfilled any duties arising from its determination, we must look to the determination FWS actually made." *Id.* at 811.

 Here, Plaintiffs allege USFWS issued the Final Rule for reintroduction of the Mexican wolf and issued the 2003 MOU and SOP 13, which resulted in the Final Rule failing to conserve the species. In other words, after USFWS issued interpretive rule SOP 13, the Mexican Wolf Reintroduction Rule was unlawful because it failed to conserve the species. Plaintiffs do not allege any failure to perform a discrete nondiscretionary act, but instead challenge as unlawful a discrete action taken by the agency. The Court will be forced to go behind USFWS' determinations to issue the Final Rule, the 2003 MOU, and SOP 13, and inquire whether under SOP 13, the Final Rule provides for the conservation of the Mexican wolf. This is not a failure to act claim under § 1540(g)(1)(C) or an APA claim under § 706(1). This claim is properly brought under ESA citizen suit provision § 1540(g)(1)(A) or the APA § 706(2), but not both.

The Court finds that the claims against USFWS[15] relying on the APA § 706(1) and § 1540(g)(1)(C) shall be dismissed. Any claim relying on the APA 706(2), which is identical to a claim which could be brought under § 1540(g)(1)(C) must also be dismissed. Guardians may proceed on claim one under the ESA citizen suit provision § 1540(g)(1)(A).[16] Defenders fifth

---

**15.** This ruling does not affect Guardians' second claim which is against the USFS for failing to act to promote conservation of the wolf, which is based on allegations that among other things the USFS failed to include any conservation provision in its grazing permits. (Complaint at 18.)

**16.** Guardians' Complaint invoked both citizen suit provisions in its jurisdictional section, but failed to invoke either section in claim one. Claim one invoked only the APA.

claim is dismissed, unless amended to state a claim under § 1540(g)(1)(A).

**Accordingly,**

**IT IS ORDERED** that the Motion to Dismiss (document 16) is DENIED.

**IT IS FURTHER ORDERED** that Guardians' claim one states a claim under the citizen suit provision of ESA, 16 U.S.C. § 1540(g)(1)(A) and not under APA.

**IT IS FURTHER ORDERED** that Defenders fifth claim is dismissed with leave to amend it. The Second Amendment shall be filed within 10 days of the filing date of this Order.

**IT IS FURTHER ORDERED** that the Request for Oral Argument (document 29) is DENIED.